# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

JOHN DRUSKINIS,

    Plaintiff,

v

STOPANTISEMITISM.ORG and
LIORA REZNICHENKO,

    Defendants.

Case No.
Hon.

---

Brian D. Wassom (P60381)
Charles C. Kadado (P86279)
WARNER NORCROSS + JUDD LLP
12900 Hall Road, Suite 200
Sterling Heights, Michigan 48313
(586) 303-4100
bwassom@wnj.com
ckadado@wnj.com
*Attorneys for Plaintiff*

*There is no other pending or resolved civil action arising out of the transaction or occurrence alleged in the complaint.*

---

## **VERIFIED COMPLAINT AND JURY DEMAND**

Plaintiff John Druskinis for his Verified Complaint against Defendants StopAntisemitism.org and Liora Reznichenko, states the following:

## PARTIES, JURISDICTION, AND VENUE

1. This is an action for defamation, false light invasion of privacy, tortious interference with contractual business and relations, and intentional infliction of emotional distress.

2. Plaintiff John Druskinis (hereinafter "Druskinis") is an adult resident of the State of Michigan who resides in Plymouth Township, County of Wayne, Michigan.

3. Upon information and belief, Defendant StopAntisemitism.org (hereinafter "SAO") is a self-proclaimed "watchdog organization."

4. Upon information and belief, Defendant Liora Reznichenko (hereinafter "Reznichenko") is an adult resident of the State of Florida who resides in Hollywood, County of Broward, Florida.

5. Upon information and belief, SAO is an unincorporated association with its principal place of business in Florida. Alternatively, it is an assumed name and alter ego of Reznichenko.

6. The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant knowingly directed the defamatory statements complained of herein in this District.

## FACTUAL BACKGROUND

9. Druskinis incorporates herein by reference each of the foregoing paragraphs.

10. Plaintiff Druskinis is a 21-year-old student at the University of Michigan in Ann Arbor. Druskinis is also a former member of the University of Michigan men's ice hockey team. He has played hockey since age 5.

11. Defendant SAO is a self-proclaimed "grassroots watchdog organization" that prides itself on "exposing groups and individuals" that "engage in antisemitic behaviors."

12. Defendant Reznichenko is the executive director of SAO.

### SAO Invents Fake Story and Falsely Labels Druskinis an Antisemite

13. On or about August 22, 2023, Druskinis and another student spray-painted graffiti on a public sidewalk in front of the Jewish Resource Center ("JRC") in Ann Arbor. The JRC elected not to prosecute the incident and the Ann Arbor Police dropped the matter. Both Druskinis and the other student subsequently made public apologies to, and fully reconciled with, the JRC.

3

14. The Ann Arbor Police released a statement that included photographs of the graffiti. These photographs did not contain swastikas or any other indication of antisemitic content of any type.

15. On or about September 30, 2023, SAO published a post on X.com (formerly Twitter.com) ("the X.com post") accusing Druskinis of "spray painting swastikas" onto the Jewish Resource Center in Ann Arbor and suggesting he was "given … the boot" for antisemitic activity. (**Exhibit 1**).

16. Specifically, the X.com post included Druskinis' photo and the following caption:

> University of Michigan hockey has given Johnny Druskinis the boot after he was caught on camera spray painting swastikas onto the Jewish Resource Center during welcome week.
>
> Thank you @umichhockey for creating actual consequences for antisemitism activity on your campus. #twitterhockey

(**Exhibit 1**).

17. SAO also published an article on their website titled, "*University of Michigan Athlete Suspended for Antisemitic Graffiti at Jewish Resource Center*" ("the Article") (**Exhibit 2**).

18. The Article alleged that Druskinis was suspended indefinitely from the University of Michigan men's hockey team for "graffitiing antisemitic … messages on the sidewalk in front of the campus' Jewish Resource Center." (**Exhibit 2**).

4

19. In addition to embedding the X.com post, the Article stated that Reznichenko said: "Removal from the hockey team is not enough … Antisemitism is prevalent on college campuses across the US, and the University of Michigan has a responsibility to either suspend or even expel this student if they are truly serious about fighting bigotry." (**Exhibit 2**).

20. The Article also reported that Druskinis' "incident" was the "second reported act of antisemitism at the University of Michigan in the last few months."

21. Further, SAO added a third-party article on its website under a heading titled, "*Antisemitic Incident Map*" ("the Map"). The Map included a red marker on Michigan with the headline, "*Michigan hockey player kicked off team after alleged antisemitic behavior.*" (**Exhibit 3**).

22. Upon information and belief, SAO and Reznichenko also prepared and distributed a press release to numerous media outlets regarding Druskinis.

23. In several news articles, Reznichenko was quoted as saying: "Druskinis is a Michigan student first and a hockey player second … Fighting the nationwide campus antisemitism crisis requires recognizing that adults bear responsibility for their actions; if Michigan believed his disgusting behavior warranted dismissal from the hockey team, they should seriously consider suspending or expelling him from the university."

24. This pleading shall refer to SAO's and Reznichenko's false and defamatory statements about Druskinis, including the X.com post, the Article, the Map, press release, Reznichenko's quoted statements, and other not yet obtained documentation, as "the Defamatory Publications."

### SAO's Fake Story Spreads Like Wildfire

25. SAO's X.com post was viewed by at least 3 million X.com users. (**Exhibit 1**). Upon information and belief, SAO's Article and Map were viewed by thousands of online users.

26. Moreover, SAO's press release reached numerous media outlets which relied on SAO's false information and Reznichenko's quotes to form their coverage.

27. Indeed, SAO and/or Reznichenko were quoted in Sports Illustrated, Fox News, USA Today, Yahoo News, MSN, CBS Sports, Michigan Daily, the Detroit Free Press, the Algemeiner, the JC News, numerous Nexstar Media Group, Inc.[1] station websites, and numerous sports blogs, just to name a few. The media headlines and/or embedded content falsely connected Druskinis to an "antisemitic" incident and/or to the spray painting of swastikas.

28. Druskinis, who is not antisemitic in any way, shape, or form, never spray-painted swastikas at the JRC, or anywhere else at any time, for that matter.

---

[1] Nexstar Media Group, Inc. is the largest television station owner in the United States, owning 200 television stations across the country.

6

29. Following SAO's X.com post, a board member of the JRC, sent a direct message to SAO on X.com informing it that its X.com post was false. SAO did not take down the post or even respond to the direct message.

30. In fact, following SAO's screed against Druskinis, the JRC published the following statement in Druskinis' defense:

> The vandalism found at the JRC was offensive and disrespectful, but did not include any overt anti-semitic symbols (like swastikas). We have been in contact with those responsible and received a private apology, as well as a subsequent public apology. The public apology took place on Shabbat, in front of over 350 people. We deliberately chose Shabbat for the public apology, knowing it would not be recorded, and thus not contribute to further public attacks. We feel continued news coverage of this incident is unwarranted and unfortunate. From our perspective, it was put to rest weeks ago.
>
> Echoing the Rabbi's Shabbat night message: this vandalism took place during the Rosh Hashana and Yom Kippur season. While the theme of Rosh Hashana is judgment, the counter balancing theme of Yom Kippur is understanding and forgiveness. As far as the JRC is concerned, these students aren't bad people and certainly don't need to have their lives ruined. While they made a poor choice, they sincerely apologized, and we have high confidence they won't repeat such actions ever again.

(**Exhibit 4**).

31. The Ann Arbor Police Department also indicated that Druskinis had nothing to do with "spray painting swastikas."

32. Prior to publishing the Defamatory Publications, SAO never contacted Ann Arbor Police or the JRC to confirm whether its publication was accurate.

7

33. Instead, SAO invented and published a completely fake news story and distributed it as wide as possible to, consistent with its mission statement, "expose" Druskinis.

34. On or about October 3, 2023, Druskinis, through counsel, sent a retraction demand letter to SAO and Liora Reznichenko. (**Exhibit 5**).

35. Subsequently, on or about October 3, 2023, SAO deleted the X.com post.

36. The following day, following yet another request from Druskinis' counsel, SAO deleted the Article from its website.

37. After yet another request, SAO deleted the Map content regarding Druskinis from its website.

38. Nevertheless, at that point, the damage was done and extensive. The X.com post was seen by over 3 million people on X.com alone, SAO and Reznichenko were quoted in numerous media outlets, and millions of people were viewing false and defamatory content about Druskinis across various sources.

39. Druskinis, through counsel, was forced to contact numerous media outlets to correct their articles, in turn incurring substantial fees to attempt to clear his name, despite the damage having taken its toll. Indeed, most credible media outlets eventually recognized that SAO's story was fake and corrected their news coverage to either remove reference to SAO or the report about spray-painting

swastikas. But by the time the media outlets' revisions were made, millions of online users already had viewed the content and made up their minds about Druskinis.

40. As orchestrated by SAO and Reznichenko, hundreds of comments and posts falsely labeled Druskinis antisemitic or accused him of spray-painting swastikas. Further, Druskinis was bombarded with hateful and threatening messages across various platforms, including messages calling him a Nazi and various profanities.

41. Druskinis also lost numerous friendships, a prospective offer to join a hockey team at a different university and was essentially confined in his own home to deal with the nightmare created by SAO and Reznichenko.

42. As of this filing, the damage continues. On or about November 28, 2023, the youth hockey team with which Druskinis volunteered parted ways with him, citing a fear of being associated with him during this time of heightened sensitivity regarding antisemitism.

43. Druskinis would not have suffered any of this harm but for the actions of Defendants, because it was Defendants alone who invented his association with antisemitism out of whole cloth.

## COUNT I - DEFAMATION

44. Druskinis incorporates herein by reference each of the foregoing paragraphs.

9

45. The above-mentioned statements made by SAO and Reznichenko concerning Druskinis, are false and defamatory.

46. SAO and Reznichenko were not privileged to publish the false statements.

47. Rather, SAO and Reznichenko published the false statements with actual malice and conscious intent to impugn and otherwise injure Druskinis, and with actual knowledge that the statements were false. At the very least, SAO and Reznichenko acted with negligence and reckless indifference as to the truth or falsity of the statements.

48. In addition to the Defamatory Publications addressed above, SAO and Reznichenko's actual malice against Druskinis is evident based upon several negative and derogatory statements they made attacking Druskinis.

49. More specifically, SAO and Reznichenko accused Druskinis of being an "antisemite," accused him of spray-painting swastikas, and called for his suspension or removal from the University of Michigan.

50. SAO and Reznichenko's actual malice is shown through the fact that they actively took credit for "exposing" Druskinis and publishing the Defamatory Publications as wide as possible, including to numerous media outlets.

51. SAO and Reznichenko also published false statements that tended to subject Druskinis to hatred, distrust, ridicule, contempt, or disgrace and tended to injure Druskinis' college and athletic career and post-college prospects.

52. SAO and Reznichenko's Defamatory Publications have caused injury to Druskinis' reputation and harmed his ability to continue playing college hockey. As a result of the Defamatory Publications, Druskinis was forced to incur significant legal and public relations fees to attempt to correct SAO and Reznichenko's false and defamatory claims, lost the opportunity to join a college hockey team, lost numerous friendships, suffered academically due to the time incurred to respond to false and defamatory allegations and to deal with the stress of same, and lost the prospect to play hockey for other colleges or professionally.

53. Further, the Defamatory Publications caused substantial injury to Druskinis in the form of mental and emotional stress.

54. On or about October 3, 2023, Druskinis identified to SAO and Reznichenko in writing the specific libels of which Druskinis complained and demanded that they be retracted. (**Exhibit 5**). This formal retraction demand letter satisfied the notice requirement of MCL 600.2911(2)(b).

55. SAO and Reznichenko failed to retract all of the false and defamatory statements they published in the manner detailed in the October 3, 2023 letter.

56. Therefore, Druskinis has the right to seek exemplary and punitive damages on top of the actual damages he has suffered at the hands of SAO and Reznichenko's defamation.

## COUNT II – FALSE LIGHT INVASION OF PRIVACY

57. Druskinis incorporates herein by reference each of the foregoing paragraphs.

58. SAO and Reznichenko published the Defamatory Publications to the public and in a manner that sought to reach as many people as possible.

59. The content of the Defamatory Publications is unreasonable and highly objectionable in that they attributed to Druskinis' characteristics, conduct, or beliefs that were false and that placed him in a false position.

60. Specifically, without limitation, SAO and Reznichenko falsely and publicly portrayed Druskinis as an antisemite who spray-painted swastikas at the Jewish Resource Center in Ann Arbor.

61. SAO and Reznichenko knew of or acted in reckless disregard as to the falsity of the Defamatory Publications and the false light in which Druskinis would be placed.

62. When SAO and Reznichenko disseminated the Defamatory Publications to the public in general and/or to a large number of people, SAO and Reznichenko did so with actual malice.

63. The Defamatory Publications have resulted in severe damage to Druskinis' reputation, has caused Druskinis to suffer severe emotional distress, and has caused Druskinis substantial economic loss.

64. SAO and Reznichenko are liable to Druskinis for false light invasion of privacy, pursuant to common law.

## COUNT III – TORTIOUS INTERFERENCE WITH CONTRACT AND BUSINESS RELATIONS

65. Druskinis incorporates herein by reference each of the foregoing paragraphs.

66. SAO and Reznichenko published the Defamatory Publications and similar statements with the intent to interfere with Druskinis' contractual relationships with prospective and existing colleges and professional hockey prospects.

67. The Defamatory Publications SAO and Reznichenko published to third parties expose prospective employers and/or hockey teams to false and misleading statements about Druskinis, which has caused at least one college team to decide against entering into contracts with Druskinis that they otherwise would have entered.

68. Through their communications on X.com, SAO.com, and with members of the media, SAO and Reznichenko sought to disseminate their false and defamatory statements as broadly as possible to inflict maximum harm on Druskinis.

69. Additionally, upon information and belief, SAO and Reznichenko contacted third parties to attempt to further harm Druskinis' academics and career.

70. As a result of SAO and Reznichenko's intentional interference, at least one college hockey team ceased all communication with Druskinis and his agent and cancelled any prospect that Druskinis had to join the team.

71. SAO and Reznichenko had knowledge of the relevant business relationships and/or expectancies.

72. SAO and Reznichenko were without excuse or justification.

73. Druskinis has suffered harm caused by SAO and Reznichenko's actions.

74. Druskinis is entitled to recover compensatory and punitive damages against SAO and Reznichenko by reason of the foregoing.

**COUNT IV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

75. Druskinis incorporates herein by reference each of the foregoing paragraphs.

76. SAO and Reznichenko's conduct in publishing the Defamatory Publications and similar statements were extreme and outrageous, for at least the following reasons:

    a. SAO and Reznichenko knew the subject matter of the Defamatory Publications is the type of content that would attract public and press

14

attention. Further, SAO and Reznichenko took intentional steps to spread the news widely to impose maximum harm on Druskinis and effectively confine him within the walls of his home.

b. SAO and Reznichenko knew that the labeling of Druskinis as an "antisemite" is the type of topic that would be widely shared with others and would result in online harassment and threats toward Druskinis and his family, including statements alleging Druskinis was a "Nazi" and various profanity-laced statements. Further, SAO and Reznichenko knew it would result in personal, professional, and financial loss.

c. The incidents described in the Defamatory Publications were either invented out of whole cloth or exaggerated to an excessive and unreasonable degree to fit SAO and Reznichenko's false and defamatory narrative.

d. As contemplated by SAO and Reznichenko, their conduct indeed resulted in personal, professional, and financial loss.

e. SAO and Reznichenko's motivation in publishing the Defamatory Publications is purely malicious.

f. Upon information and belief, SAO and Reznichenko's actions were motivated, at least in part, due to their desire to harm Druskinis'

15

reputation, draw attention to their organization, and collect donations.

77. SAO and Reznichenko published the Defamatory Publications with the intent to cause Druskinis harm, or at the very least with reckless indifference as to the harm they caused Druskinis.

78. Any reasonable person would know that emotional distress would result from the Defamatory Publications made by SAO and Reznichenko about Druskinis.

79. Indeed, Druskinis has suffered severe emotional distress and significant economic loss as a result of the Defamatory Publications.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff JOHN DRUSKINIS prays that this Honorable Court enter judgment against Defendants STOPANTISEMITISM.ORG and LIORA REZNICHENKO and grant the following relief:

A. Actual damages in an amount more than $75,000;

B. Exemplary, special, and/or punitive damages;

C. Costs and attorneys' fees;

D. Prejudgment and/or post-judgment interest;

E. A permanent injunction (a) requiring Defendants to retract the Defamatory Publications identified in this Complaint and (b) prohibiting Defendants

from publishing similar statements about Druskinis on their own behalf, on the behalf of other people, or on behalf of organizations or other entities; and

  F. Any further relief, in law or in equity, that this Court deems appropriate.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS OF FACT ARE TRUE TO THE BEST OF MY INFORMATION, KNOWLEDGE AND BELIEF.

_____
JOHN DRUSKINIS

              Respectfully submitted,

Dated: December 1, 2023   By: */s/ Brian D. Wassom*
              Brian D. Wassom (P60381)
              Charles C. Kadado (P86279)
              WARNER NORCROSS + JUDD LLP
              12900 Hall Road, Suite 200
              Sterling Heights, Michigan 48313
              (586) 303-4100
              Attorneys for Plaintiff
              bwassom@wnj.com
              ckadado@wnj.com

## **CERTIFICATE OF SERVICE**

Denise Keilch states that on December 1, 2023 she caused to be served the foregoing document and this Certificate of Service via the court's electronic filing system, which will send notification of such filing to all attorneys on record.

I declare that the above statement is true to the best of my knowledge, information and belief.

*/s/ Denise Keilch*
Denise Keilch