# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

JOHN DRUSKINIS,

    Plaintiff,

v

STOPANTISEMITISM.ORG and
LIORA REZNICHENKO,

    Defendants.

Case No. 2:23-cv-13046

District Judge: Stephen J. Murphy III
Magistrate Judge: Elizabeth A. Stafford

---

Brian D. Wassom (P60381)
Charles C. Kadado (P86279)
WARNER NORCROSS + JUDD
    LLP
12900 Hall Road, Suite 200
Sterling Heights, Michigan 48313
(586) 303-4100
bwassom@wnj.com
ckadado@wnj.com
*Attorneys for Plaintiff*

Andrew M. Pauwels (P79167)
Jalen R. Farmer (P86859)
HONIGMAN LLP
660 Woodward Avenue
Detroit, MI 48226-3506
(313) 465-7290
apauwels@honigman.com
jfarmer@honigman.com

Michael J. Grygiel (*application for admission forthcoming*)
GREENBERG TRAURIG, LLP
54 State Street, 6th Floor
Albany, NY 12207
(518) 689-1400
grygielm@gtlaw.com

Scott J. Bornstein
GREENBERG TRAURIG, LLP
One Vanderbilt Avenue
New York, NY 10017
(212) 801-9200
scott.bortein@gtlaw.com

1

Bradford D. Kaufman
GREENBERG TRAURIG, P.A.
777 South Flagler Drive
Suite 300 East
West Palm Beach, FL 33401
(561) 650-7900
kaufmanb@gtlaw.com

Zachary Needell
GREENBERG TRAURIG, P.A.
401 East Las Olas Boulevard
Suite 2000
Fort Lauderdale, FL 33301
(954) 765-0500
Zachary.Needell@gtlaw.com

*Attorneys Pro Bono Publico for*
*Defendants*

---

## VERIFIED FIRST AMENDED COMPLAINT AND JURY DEMAND

Plaintiff John Druskinis for his Verified First Amended Complaint against

Defendants StopAntisemitism.org a/k/a StopAntisemitism[1] and Liora Reznichenko,

states the following:

---

[1] In one filing, defense counsel claims that this Defendant's proper name is "StopAntisemitism" and not "StopAntisemitism.Org." (ECF 13, PgID). Yet counsel also signed a corporate disclosure statement that adopts the "StopAntisemitism.Org" name. (ECF 15, PgID 237). Nor is it yet clear that this entity is anything more than an unincorporated sole proprietorship. Regardless, all parties appear to be referring to the same entity. Until this confusion is resolved, Plaintiff maintains the current caption, with the understanding that it may need to be revised.

## PARTIES, JURISDICTION, AND VENUE

1.      This is an action for defamation, false light invasion of privacy, tortious interference with contractual business and relations, and intentional infliction of emotional distress.

2.      Plaintiff John Druskinis (hereinafter "Druskinis") is an adult resident of the State of Michigan who resides in Plymouth Township, County of Wayne, Michigan.

3.      Defendant StopAntisemitism.org (hereinafter "SAO") is a self-proclaimed "watchdog organization."

4.      Defendant Liora Reznichenko (hereinafter "Reznichenko") is an adult resident of the State of Florida who resides in Hollywood, County of Broward, Florida.

5.      SAO is an unincorporated association with its principal place of business in Florida. Alternatively, it is an assumed name and alter ego of Reznichenko. SAO has claimed to have locations in Washington, DC and New York; however, there is no evidence the organization has any physical presence there. Indeed, the address it advertises in Washington, DC leads to a vacant building. On information and belief, every publication SAO publishes is written by Reznichenko, every public appearance under SAO's name is carried out by Reznichenko, and Reznichenko is the only agent of SAO. Despite diligent searching, Plaintiff cannot

3

locate any record indicating that SAO actually exists as a legal entity, and Reznichenko appears to be its only mouthpiece. All of this evidence and experience strongly suggests that SAO is nothing more than Reznichenko's alter ego.

6. The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant knowingly directed the defamatory statements complained of herein in this District.

## FACTUAL BACKGROUND

9. Druskinis incorporates herein by reference each of the foregoing paragraphs.

10. Plaintiff Druskinis is a 21-year-old student at the University of Michigan in Ann Arbor. Druskinis is also a former member of the University of Michigan men's ice hockey team. He has played hockey since age 5.

11. Defendant SAO is a self-proclaimed "grassroots watchdog organization" that prides itself on "exposing groups and individuals" that "engage

in antisemitic behaviors." SAO operates a website, stopantisemitism.org, and multiple social media platforms with significant online reach.

12.    Defendant Reznichenko is the executive director of SAO.

### SAO Invents Fake Story and Falsely Labels Druskinis an Antisemite

13.    On or about August 22, 2023, Druskinis and another student spray-painted graffiti on a public sidewalk in front of the Jewish Resource Center ("JRC") in Ann Arbor. The JRC elected not to prosecute the incident and the Ann Arbor Police dropped the matter. Both Druskinis and the other student subsequently made public apologies to, and fully reconciled with, the JRC.

14.    The Ann Arbor Police released a statement that included photographs of the graffiti. These photographs did not contain swastikas or any other indication of antisemitic content of any type.

15.    On or about September 30, 2023, SAO published a post on X.com (formerly Twitter.com) ("the X.com post") accusing Druskinis of "spray painting swastikas" onto the Jewish Resource Center in Ann Arbor and suggesting he was "given … the boot" for antisemitic activity. (**Exhibit 1**).

16.    Specifically, the X.com post included Druskinis' photo and the following caption:

> University of Michigan hockey has given Johnny Druskinis the boot after he was caught on camera spray painting swastikas onto the Jewish Resource Center during welcome week.

5

Thank you @umichhockey for creating actual consequences for antisemitism activity on your campus. #twitterhockey

(**Exhibit 1**).

17.    SAO also published an article on their website titled, "*University of Michigan Athlete Suspended for Antisemitic Graffiti at Jewish Resource Center*" ("the Article") (**Exhibit 2**).

18.    The Article alleged that Druskinis was suspended indefinitely from the University of Michigan men's hockey team for "graffitiing antisemitic … messages on the sidewalk in front of the campus' Jewish Resource Center." (**Exhibit 2**).

19.    In addition to embedding the X.com post, the Article stated that Reznichenko said: "Removal from the hockey team is not enough … Antisemitism is prevalent on college campuses across the US, and the University of Michigan has a responsibility to either suspend or even expel this student if they are truly serious about fighting bigotry." (**Exhibit 2**).

20.    In other words, Reznichenko targeted Druskinis individually with her invective, and directed a specific call to action to University of Michigan leadership to "suspend or even expel" Druskinis. (**Exhibit 2**). Self-evidently, Reznichenko knew that the University of Michigan is located in Michigan, and that she was intentionally seeking to interfere in the enrollment contract and relationship between the university and Druskinis that was being performed in Michigan.

21.     Further, Reznichenko's statements reveal her awareness that Druskinis was a Michigan resident attending school in Ann Arbor, Michigan. She certainly should have known, and did know, that her words would cause Druskinis harm that he would suffer in Michigan. In addition, her statements all concerned actions that occurred in Michigan.

22.     The Article also reported that Druskinis' "incident" was the "second reported act of antisemitism at the University of Michigan in the last few months."

23.     Further, SAO added a third-party article on its website under a heading titled, "*Antisemitic Incident Map*" ("the Map"). The Map included a red marker on Michigan with the headline, "*Michigan hockey player kicked off team after alleged antisemitic behavior*." (**Exhibit 3**).

24.     Upon information and belief, SAO and Reznichenko also prepared and distributed a press release to numerous media outlets regarding Druskinis, including to media outlets in Michigan.

25.     In several news articles, Reznichenko was quoted as saying: "Druskinis is a Michigan student first and a hockey player second … Fighting the nationwide campus antisemitism crisis requires recognizing that adults bear responsibility for their actions; if Michigan believed his disgusting behavior warranted dismissal from the hockey team, they should seriously consider suspending or expelling him from the university."

26.     This pleading shall refer to SAO's and Reznichenko's false and defamatory statements about Druskinis, including the X.com post, the Article, the Map, press release, Reznichenko's above-quoted statements, and other not yet obtained documentation, as "the Defamatory Publications."

### SAO's Fake Story Spreads Like Wildfire

27.     SAO's X.com post was viewed by at least 3 million X.com users. (**Exhibit 1**). Upon information and belief, SAO's Article and Map were viewed by thousands of online users.

28.     Moreover, SAO's press release reached numerous media outlets which relied on SAO's false information and Reznichenko's quotes to form their coverage.

29.     Indeed, SAO and/or Reznichenko were quoted in Sports Illustrated, Fox News, USA Today, Yahoo News, MSN, CBS Sports, Michigan Daily, the Detroit Free Press, the Algemeiner, the JC News, numerous Nexstar Media Group, Inc.[2] station websites, and numerous sports blogs, just to name a few. The media headlines and/or embedded content falsely connected Druskinis to an "antisemitic" incident and/or to the spray painting of swastikas.[3]

---

[2] Nexstar Media Group, Inc. is the largest television station owner in the United States, owning 200 television stations across the country.

[3] SAO and Reznichenko's extensively reached out to media outlets in their concerted effort to disseminate the fabricated story as widely as possible. Their contacts will be a focal point for discovery.

30.     Druskinis, who is not antisemitic in any way, shape, or form, never spray-painted swastikas or antisemitic graffiti at the JRC, or anywhere else at any time, for that matter.

31.     Following SAO's X.com post, a board member of the JRC, sent a direct message to SAO on X.com informing it that its X.com post was false. SAO did not take down the post or even respond to the direct message.

32.     In fact, following SAO's screed against Druskinis, the JRC published the following statement in Druskinis' defense:

> The vandalism found at the JRC was offensive and disrespectful, but did not include any overt anti-semitic symbols (like swastikas). We have been in contact with those responsible and received a private apology, as well as a subsequent public apology. The public apology took place on Shabbat, in front of over 350 people. We deliberately chose Shabbat for the public apology, knowing it would not be recorded, and thus not contribute to further public attacks. We feel continued news coverage of this incident is unwarranted and unfortunate. From our perspective, it was put to rest weeks ago.
>
> Echoing the Rabbi's Shabbat night message: this vandalism took place during the Rosh Hashana and Yom Kippur season. While the theme of Rosh Hashana is judgment, the counter balancing theme of Yom Kippur is understanding and forgiveness. As far as the JRC is concerned, these students aren't bad people and certainly don't need to have their lives ruined. While they made a poor choice, they sincerely apologized, and we have high confidence they won't repeat such actions ever again.
>
> (**Exhibit 4**).

9

33.     Rabbi Mendy Klahr of the Jewish Resource Center further clarified that "there wasn't any swastikas," noting that "there's a difference between [what Druskinis drew] and a swastika." (**Exhibit 5**).

34.     The Ann Arbor Police Department also indicated that Druskinis had nothing to do with "spray painting swastikas."

35.     Prior to publishing the Defamatory Publications, SAO never contacted Ann Arbor Police or the JRC to confirm whether its publication was accurate.

36.     Instead, SAO invented and published a completely fake news story and distributed it as wide as possible to, consistent with its mission statement, "expose" Druskinis.

37.     On or about October 3, 2023, Druskinis, through counsel, sent a retraction demand letter to SAO and Liora Reznichenko. (**Exhibit 6**).

38.     Subsequently, on or about October 3, 2023, SAO deleted the X.com post.

39.     The following day, following yet another request from Druskinis' counsel, SAO deleted the Article from its website.

40.     After yet another request, SAO deleted the Map content regarding Druskinis from its website.

41.     Nevertheless, at that point, the damage was done and extensive. The X.com post was seen by over 3 million people on X.com alone, SAO and

10

Reznichenko were quoted in numerous media outlets, and millions of people were viewing false and defamatory content about Druskinis across various sources.

42.    Druskinis, through counsel, was forced to contact numerous media outlets to correct their articles, in turn incurring substantial fees to attempt to clear his name, despite the damage having taken its toll. Indeed, most credible media outlets eventually recognized that SAO's story was fake and corrected their news coverage to either remove reference to SAO or the report about spray-painting swastikas. But by the time many media outlets' revisions were made, millions of online users already had viewed the content and made up their minds about Druskinis.

43.    As orchestrated by SAO and Reznichenko, hundreds of comments and posts falsely labeled Druskinis antisemitic or accused him of spray-painting swastikas or other antisemitic graffiti. Further, Druskinis was bombarded with hateful and threatening messages across various platforms, including messages calling him a Nazi and various profanities.

44.    Druskinis also lost numerous friendships, a prospective offer to join a hockey team at a different university and was essentially confined in his own home to deal with the nightmare created by SAO and Reznichenko.

45.    As of this filing, the damage continues. On or about November 28, 2023, the youth hockey team with which Druskinis volunteered parted ways with

him, citing a fear of being associated with him during this time of heightened sensitivity regarding antisemitism. While attending a youth hockey tournament in Troy, MI, Druskinis witnessed a couple talking about him while displaying an image of SAO's X.com post on their phone. In November 2023, Druskinis learned from a friend at Colorado College in Colorado Springs, CO that during a class discussion, students talked about a University of Michigan player who "spray painted swastikas." As recent as March 9, 2024, Druskinis was referred to as "Swastika boy" by a third party while he was at a business in Royal Oak, MI.

46.    Druskinis would not have suffered any of this harm but for the actions of Defendants, because it was Defendants alone who invented his association with antisemitism, and specifically with the claim that he spray-painted swastikas, out of whole cloth.

## <u>COUNT I - DEFAMATION</u>

47.    Druskinis incorporates herein by reference each of the foregoing paragraphs.

48.    The statements made by SAO and Reznichenko concerning Druskinis, are false and defamatory, to wit:

    a.    "University of Michigan hockey has given Johnny Druskinis the boot after he was caught on camera spray painting swastikas onto the Jewish

Resource Center during welcome week. Thank you @umichhockey for creating actual consequences for antisemitic activity on your campus...." (**Exhibit 1**).

b. "Druskinis was caught in the act of graffiting the hateful messages in broad daylight by a surveillance camera on the property." (**Exhibit 2**).

c. "[Druskinis] has been suspended indefinitely from the school's men's hockey team for graffiting antisemitic … messages on the sidewalk in front of the campus' Jewish Resource Center …" (**Exhibit 2**).

d. "The incident is the second reported act of antisemitism at the University of Michigan in the last few months." (**Exhibit 2**).

e. ". . . the University of Michigan has a responsibility to either suspend or even expel this student if they are truly serious about fighting bigotry." (**Exhibit 2**).

f. "Michigan hockey player kicked off team after alleged antisemitic behavior." (**Exhibit 3**).

g. Any materially identical statements that Defendants are found to have made. On information and belief, SAO and Reznichenko also made other statements to members of the press and other third parties that will be the subject of discovery.

49.    SAO and Reznichenko were not privileged to publish the false statements.

50.    Rather, SAO and Reznichenko published the false statements with actual malice and conscious intent to impugn and otherwise injure Druskinis, and with actual knowledge that the statements were false. At the very least, SAO and Reznichenko acted with negligence and reckless indifference as to the truth or falsity of the statements.

51.    In addition to the Defamatory Publications addressed above, SAO and Reznichenko's actual malice against Druskinis is evident based upon several negative and derogatory statements they made attacking Druskinis.

52.    More specifically, SAO and Reznichenko accused Druskinis of spray-painting swastikas, being an "antisemite," and "graffitiing" other antisemitic messages onto the Jewish Resource Center in Ann Arbor. They also called for Druskinis' suspension or removal from the University of Michigan.

53.    As a "watchdog organization" purportedly existing to combat antisemitism, Defendants would be acutely aware that spray painting a swastika is an abhorrent act that qualifies as a hate crime.

54.    SAO and Reznichenko's actual malice is also shown through the fact that they knew Druskinis did not spray-paint swastikas at the Jewish Resource Center, nor did they have a scintilla of evidence to the contrary. At the very least,

14

SAO and Reznichenko failed to investigate the veracity of their allegations before hastily propagating a false narrative solely to provoke public indignation and draw attention to their organization.

55.     Defendants' actual malice is further demonstrated by the fact that they accused Druskinis of spray-painting other unidentified "messages," when in fact the only graffiti other than the image and one word that Druskinis painted was the letters "MEM." These were not even painted by Druskinis, but by another student named Megan Elizabeth Minturn, who wrote her initials on the sidewalk. On information and belief, Defendants knew at the time they made their Defamatory Publications that Druskinis had not written any "antisemitic messages." Moreover, Defendants did not target or post content regarding Minturn; their attention was solely on Druskinis.

56.     On information and belief, at the time Defendants published their Defamatory Publications, they did not have access to the police report about the incident.

57.     Even when SAO and Reznichenko were contacted by Druskinis' counsel, they obstinately refused to meaningfully retract their statements and/or apologize for the same.

58.   Indeed, SAO and Reznichenko actively took credit for "exposing" Druskinis and publishing the Defamatory Publications as wide as possible, including to numerous media outlets.

59.   Further, SAO and Reznichenko published false statements that tended to subject Druskinis to hatred, distrust, ridicule, contempt, or disgrace and tended to injure Druskinis' college and athletic career and post-college prospects.

60.   SAO and Reznichenko committed defamation *per se* in that they published false and defamatory statements intended to impute the commission of a criminal offense. Specifically, and without limitation, SAO and Reznichenko's allegations that Druskinis spray-painted swastikas and other "antisemitic messages" on the Jewish Resource Center constitute a hate crime under federal law and qualify as ethnic intimidation, a felony offense, under Michigan law.

61.   At a minimum, the acts that Defendants falsely accused Druskinis of committing are materially worse and more damaging to his reputation than the truth is.

62.   SAO and Reznichenko's Defamatory Publications have caused injury to Druskinis' reputation and harmed his ability to continue playing college hockey. As a result of the Defamatory Publications, Druskinis was forced to incur significant legal and public relations fees to attempt to correct SAO and Reznichenko's false and defamatory claims, lost the opportunity to join a college hockey team, lost

16

numerous friendships, suffered academically due to the time incurred to respond to false and defamatory allegations and to deal with the stress of same, and lost the prospect to play hockey for other colleges or professionally.

63.     Further, the Defamatory Publications caused substantial injury to Druskinis in the form of mental and emotional stress. For example, Druskinis has been subject to ridicule and contempt, and has been forced to seek therapy to cope with the experience.

64.     On or about October 3, 2023, Druskinis identified to SAO and Reznichenko in writing the specific libels of which Druskinis complained and demanded that they be retracted. (**Exhibit 6**). This formal retraction demand letter satisfied the notice requirement of MCL 600.2911(2)(b).

65.     SAO and Reznichenko failed to retract all of the false and defamatory statements they published in the manner detailed in the October 3, 2023 letter.

66.     Therefore, Druskinis has the right to seek exemplary and punitive damages on top of the actual damages he has suffered at the hands of SAO and Reznichenko's defamation.

67.     In addition, as a private individual, Druskinis has the right to seek attorneys' fees under MCL 600.2911(7).

## COUNT II – FALSE LIGHT INVASION OF PRIVACY

68.     Druskinis incorporates herein by reference each of the foregoing paragraphs.

69.     SAO and Reznichenko published the Defamatory Publications to the public and in a manner that sought to reach as many people as possible.

70.     The content of the Defamatory Publications is unreasonable and highly objectionable in that they attributed to Druskinis' characteristics, conduct, or beliefs that were false and that placed him in a false position.

71.     Specifically, without limitation, SAO and Reznichenko falsely and publicly portrayed Druskinis as an antisemite who spray-painted swastikas and other antisemitic graffiti at the Jewish Resource Center in Ann Arbor.

72.     Prior to SAO and Reznichenko's Defamatory Publications, Druskinis was not a public figure and his name was not known to the public with respect to this incident.

73.     SAO and Reznichenko knew of or acted in reckless disregard as to the falsity of the Defamatory Publications and the false light in which Druskinis would be placed.

74.     When SAO and Reznichenko disseminated the Defamatory Publications to the public in general and/or to a large number of people, SAO and Reznichenko did so with actual malice. Among other things, as explained above, Defendants demonstrated both subjective ill will toward Druskinis and published

their Defamatory Publications despite their actual knowledge, and/or reckless indifference as to the likelihood, that the Defamatory Publications were false.

75.     Specifically, SAO and Reznichenko failed to perform even the most rudimentary diligence into the accuracy of their "swastikas" statements—as evidenced by their failure to contact the Jewish Resource Center, Ann Arbor Police, or the University of Michigan Division of Public Safety and Security. Despite Druskinis' counsel issuing a retraction demand, SAO and Reznichenko refused to meaningfully retract and/or apologize for their statements.

76.     SAO and Reznichenko were fully aware that their information about Druskinis was false, yet they posted about him with the intent to "expose" him and decimate his reputation and prospects at a career in hockey or otherwise.

77.     The Defamatory Publications have resulted in severe damage to Druskinis' reputation, has caused Druskinis to suffer severe emotional distress, and has caused Druskinis substantial economic loss.

78.     SAO and Reznichenko are liable to Druskinis for false light invasion of privacy, pursuant to common law.

<u>COUNT III – TORTIOUS INTERFERENCE WITH<br>BUSINESS RELATIONS</u>

79.     Druskinis incorporates herein by reference each of the foregoing paragraphs.

19

80.    SAO and Reznichenko published the Defamatory Publications and similar statements with the intent to interfere with Druskinis' relationships with prospective college and professional hockey prospects.

81.    The Defamatory Publications SAO and Reznichenko published to third parties expose prospective employers and/or hockey teams to false and misleading statements about Druskinis, which has caused at least one college team to decide against entering into contracts with Druskinis that they otherwise would have entered.

82.    Through their communications on X.com, SAO.com, and with members of the media, SAO and Reznichenko sought to disseminate their false and defamatory statements as broadly as possible to inflict maximum harm on Druskinis.

83.    Additionally, upon information and belief, SAO and Reznichenko contacted third parties to attempt to further harm Druskinis' academics and career.

84.    It is common knowledge that college athletes often transfer to play at other schools, and that they frequently try out for and are selected to play on professional sports teams. Defendants needed no further information to know that those options were reasonably available to Druskinis.

85.    SAO and Reznichenko's Defamatory Publications, crafted to incite public fury, also prompted third parties to contact Druskinis' school and prospective business relationships with the goal of sabotaging his career prospects.

20

86.     As a result of SAO and Reznichenko's intentional interference, at least one college hockey team ceased all communication with Druskinis and his advisor and cancelled any prospect that Druskinis had to join the team.

87.     Further, Druskinis has been denied opportunities to join other college hockey teams who have expressly indicated to his advisor they would not take him due to the allegations created by SAO and Reznichenko.

88.     While it is common for college hockey players to have opportunities to join other teams, the Defamatory Publications significantly impeded and delayed this prospect, if any, for Druskinis.

89.     Druskinis similarly was stripped of his role as a coach for a youth hockey team due to fears about being linked to him amidst heightened sensitivity surrounding antisemitism.

90.     SAO and Reznichenko knew or should have known that Druskinis would have opportunities to play for other college hockey teams despite leaving the Michigan team. On information and belief, Defendants intended their Defamatory Publications to interfere with and sabotage these opportunities.

91.     SAO and Reznichenko's actions were without excuse or justification.

92.     Druskinis has suffered harm caused by SAO and Reznichenko's actions.

93.    Druskinis is entitled to recover compensatory and punitive damages against SAO and Reznichenko by reason of the foregoing.

## COUNT IV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

94.    Druskinis incorporates herein by reference each of the foregoing paragraphs.

95.    SAO and Reznichenko's conduct in publishing the Defamatory Publications and similar statements were extreme and outrageous, for at least the following reasons:

    a.  SAO and Reznichenko were acutely aware, particularly given their organization's mission to combat antisemitism, that falsely accusing someone of "spray painting swastikas" is a reprehensible act that qualifies as a hate crime.

    b.  SAO and Reznichenko knew the subject matter of the Defamatory Publications is the type of content that would attract public and press attention. Further, SAO and Reznichenko took intentional steps to spread the news widely to impose maximum harm on Druskinis and effectively confine him within the walls of his home.

    c.  SAO and Reznichenko knew that the labeling of Druskinis as an "antisemite" is the type of topic that would be widely shared with others and would result in online harassment and threats toward

Druskinis and his family, including statements alleging Druskinis was a "Nazi," "Swastika boy," and various profanity-laced statements. Further, SAO and Reznichenko knew it would result in personal, professional, and financial loss.

d. The incidents described in the Defamatory Publications were either invented out of whole cloth or exaggerated to an excessive and unreasonable degree to fit SAO and Reznichenko's false and defamatory narrative.

e. As contemplated by SAO and Reznichenko, their conduct indeed resulted in personal, professional, and financial loss.

f. Specifically, Druskinis has endured egregious public denigrations, including being branded a "Nazi" and "Swastika boy," among other highly reprehensible epithets, both online and in public.

g. Further, Druskinis experienced significant social alienation, a decline in academic performance, the loss of numerous friends and acquaintances, and persistent harassment on campus, which led to him having to drop a class.

h. The psychological toll of having SAO and Reznichenko falsely invent a story that Druskinis "spray painted swastikas" and tagged a Jewish Resource Center with other antisemitic graffiti turned his life

23

upside down and has necessitated significant therapy to address the continuous harm caused by SAO and Reznichenko.

i.   SAO and Reznichenko's motivation in publishing the Defamatory Publications is purely malicious.

j.   Upon information and belief, SAO and Reznichenko's actions were motivated, at least in part, due to their desire to harm Druskinis' reputation, draw attention to their organization, and collect donations for their organization.

96.   SAO and Reznichenko published the Defamatory Publications with the intent to cause Druskinis harm, or at the very least with reckless indifference as to the harm they caused Druskinis.

97.   Any reasonable person would know that emotional distress would result from the Defamatory Publications made by SAO and Reznichenko about Druskinis.

98.   Indeed, Druskinis has suffered severe emotional distress and significant economic loss as a result of the Defamatory Publications.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff JOHN DRUSKINIS prays that this Honorable Court enter judgment against Defendants STOPANTISEMITISM.ORG and LIORA REZNICHENKO and grant the following relief:

24

A.     Actual damages in an amount more than $75,000;

B.     Exemplary, special, and/or punitive damages;

C.     Costs and attorneys' fees under MCL 600.2911(7);

D.     Prejudgment and/or post-judgment interest;

E.     A permanent injunction (a) requiring Defendants to retract the Defamatory Publications identified in this Complaint and (b) prohibiting Defendants from publishing similar statements about Druskinis on their own behalf, on the behalf of other people, or on behalf of organizations or other entities; and

F.     Any further relief, in law or in equity, that this Court deems appropriate.


I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS OF FACT ARE TRUE TO THE BEST OF MY INFORMATION, KNOWLEDGE AND BELIEF.

_____

JOHN DRUSKINIS

Respectfully submitted,

Dated:     March 25, 2023            By:   */s/ Brian D. Wassom*
                                          Brian D. Wassom (P60381)
                                          Charles C. Kadado (P86279)
                                          WARNER NORCROSS + JUDD LLP
                                          12900 Hall Road, Suite 200
                                          Sterling Heights, Michigan 48313
                                          (586) 303-4100
                                          Attorneys for Plaintiff
                                          bwassom@wnj.com
                                          ckadado@wnj.com

## <u>CERTIFICATE OF SERVICE</u>

Denise Keilch states that on March 25, 2024 she caused to be served the foregoing document and this Certificate of Service via the court's electronic filing system, which will send notification of such filing to all attorneys on record.

I declare that the above statement is true to the best of my knowledge, information and belief.

*/s/ Denise Keilch*
Denise Keilch
