## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JOHN DRUSKINIS,                         Case No. 2:23-cv-13046
     Plaintiff,                        Hon. Susan K. DeClercq

v

STOPANTISEMITISM.ORG and
LIORA REZNICHENKO,

    Defendants.

_____

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(2) AND 12(B)(6)

Brian D. Wassom (P60381)
Charles C. Kadado (P86279)
WARNER NORCROSS + JUDD LLP
12900 Hall Road, Suite 200
Sterling Heights, Michigan 48313
(586) 303-4100
bwassom@wnj.com
ckadado@wnj.com

*Attorneys for Plaintiff*

## STATEMENT OF ISSUES PRESENTED

The following are the issues presented by Defendants' Motion:

### Personal Jurisdiction

1.     Does Plaintiff meet his "relatively slight" burden of showing that personal jurisdiction exists under Rule 12(b)(2) where the Court may rely on Plaintiff's factual allegations in his Verified First Amended Complaint ("FAC") and Defendants failed to submit testimony?

2.     Does the Court have personal jurisdiction over Defendants where Plaintiff demonstrated that Defendant intentionally and specifically targeted defamatory communications at Michigan and the brunt of the harm was felt in Michigan?

3.     Alternatively, if the Court has any doubt about personal jurisdiction, should the Court order jurisdictional discovery and transfer the case to Florida federal court in the interest of justice?

### Defamation

4.     Does Defendants' "substantial truth" argument fail in light of the glaring and common-sense differences between spray painting swastikas, the world's most notorious symbol of hate, and engaging in an immature college joke?

5.     Does Defendants' assertion of protected opinion fail where Defendants falsely accused Plaintiff of spray-painting swastikas with no basis in fact?

i

6.     Is Defendants' contention regarding the fair reporting privilege of a police report misplaced, given that such privilege does not extend to Defendants and Defendants' alleged statements were not derived from the police report?

**False Light**

7.     Did Plaintiff state a viable false light claim where Defendants broadcasted false accusations about Plaintiff to millions of people and portrayed him in a false position that a reasonable person would find offensive and objectionable?

**Tortious Interference**

8.     Does Plaintiff's tortious interference claim survive where Plaintiff's FAC demonstrated a "reasonable likelihood or probability" of valid business expectancies that Plaintiff lost as a result of Defendants' actions?

**Intentional Infliction of Emotional Distress**

9.     Is Plaintiff's claim for intentional infliction of emotional distress best left in the hands of the factfinder where Plaintiff's allegations have sufficiently created a question of fact as to Defendants' extreme and outrageous conduct?

Plaintiff answers "**yes**" to each of these questions.

# CONTROLLING OR MOST APPROPRIATE AUTHORITY

PAGE(S)

**Rule 12(b)(2)**

*Estate of Thomson v. Toyota Motor Corp.*,
    545 F.3d 357 (6th Cir. 2008) ...................................................................6

*In re Packaged Ice Antitrust Litig.*,
    723 F. Supp. 2d 987 (E.D. Mich. 2010) ...............................................6

**Personal Jurisdiction**

*Calder v. Jones*,
    465 U.S. 783 (1984)....................................................................7, 9

*Goldlawr, Inc. v. Heiman*,
    369 U.S. 463 (1962)......................................................................12

*Johnson v. Griffin*,
    85 F.4th 429 (6th Cir. 2023) ...........................................................9, 10

**Rule 12(b)(6)**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).......................................................................14

**Defamation**

*As to claim regarding substantial truth:*

*Lakin v. Rund*,
    318 Mich. App. 127 (2016) ...............................................................19

*Mullenmeister v. Snap-On Tools Corp.*,
    587 F. Supp. 868 (S.D.N.Y. 1984) ...............................................18, 23

*As to claim regarding fair report privilege:*

MCL 600.2911(3) ...................................................................................21

*Punturo v. Kern*,
   506 Mich. 1009, 951 N.W.2d 342 (2020) ........................................................22

*Northland Wheels Roller Skating Ctr. v. Detroit Free Press*,
   213 Mich. App. 317, 539 N.W.2d 774 (1995)...................................................20

**As to claim regarding opinion:**

*Milkovich v. Lorain Journal Co*.,
   497 U.S. 1 (1990)...............................................................................................22

*Mullenmeister v. Snap-On Tools Corp*.,
   587 F. Supp. 868 (S.D.N.Y. 1984) .............................................................18, 23

## <u>False Light</u>

*Sawabini v. Desenberg*,
   143 Mich. App. 373, 372 N.W.2d 559 (1985)..................................................25

## <u>Tortious Interference</u>

*P.T. Today, Inc. v. Comm'r of Off. of Fin. & Ins. Servs*.,
   270 Mich. App. 110, 715 N.W.2d 398 (2006)..................................................27

*Trepel v. Pontiac Osteopathic Hosp*.,
   135 Mich. App. 361, 354 N.W.2d 341 (1984)..................................................28

## <u>Intentional Infliction of Emotional Distress</u>

*Armstrong v. Shirvell*,
   596 F. App'x 433 (6th Cir. 2015) ..............................................................29, 30

*Mroz v. Lee*,
   5 F.3d 1016 (6th Cir. 1993) ........................................................................29, 30

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ....................................................................... vii

I.   INTRODUCTION ....................................................................................1

II.  COUNTER-STATEMENT OF FACTS...........................................2

   A. The Parties.................................................................................2

   B. SAO and Reznichenko Accuse Druskinis of Spray Painting Swastikas .........3

   C. SAO and Reznichenko's False Stories Reach Millions.....................................4

   D. Druskinis Files Lawsuit Against Reznichenko.................................................5

III. ARGUMENT....................................................................................6

   A. This Court Has Personal Jurisdiction Because Defendants Intentionally and Specifically Targeted Michigan in Multiple Ways...........................................6

     1. Defendants' Failure to Submit Testimony Dooms Their Motion................6

     2. Defendants Targeted This Forum and Caused Harm Here ..........................6

     3. Defendants' Own Case Citations Establish Jurisdiction Here.....................9

     4. Alternatively, the Court Should Order Jurisdictional Discovery and Transfer the Case to Florida...........................................................................12

   B. Druskinis' Defamation Claim Stands, Because Reznichenko's Lies Injured His Reputation Materially More Than the Truth Would Have .....................14

     1. The *Iqbal* "Common Sense" Standard .......................................................14

     2. Reznichenko's Statements Were Not Substantially True ...........................14

     3. The Statements Are Not a Fair Report .......................................................19

     4. The "Antisemitic" Comments Are Not Protected Opinion.........................22

C. Druskinis Has a Valid False Light Claim ........................................................24

D. Druskinis Has Pled Sufficient Facts for Tortious Interference Claim............26

E. Druskinis Has Viable Intentional Infliction of Emotional Distress Claim.....29

IV. CONCLUSION...................................................................................................30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Armstrong v. Shirvell*,
   596 F. App'x 433 (6th Cir. 2015) .................................................................29, 30

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...........................................................................................14

*Atkinson v. Farley*,
   431 N.W.2d 95 (1988) .......................................................................................30

*Blessing v. Chandrasekhar*,
   988 F.3d 889 (6th Cir. 2021) ....................................................................7, 9, 11

*Calder v. Jones*,
   465 U.S. 783 (1984) .......................................................................................7, 9

*Carrier Corp. v. Outokumpu Oyj*,
   673 F.3d 430 (6th Cir. 2012) ............................................................................7

*Dickinson v. Austin*,
   942 F.2d 791 (9th Cir. 1991) ...........................................................................18

*Dubin v. United States*,
   380 F.2d 813 (5th Cir. 1967) ...........................................................................12

*Endoscopy Corp. of Am. v. Kenaan*,
   No. 359398, 2023 WL 2439487 (Mich. Ct. App. Mar. 9, 2023).......................28

*Goldlawr, Inc. v. Heiman*,
   369 U.S. 463 (1962).........................................................................................12

*JM-Nipponkoa Ins. Co. v. Dove Transp., LLC*,
   No. 1:14-cv-202, 2015 U.S. Dist. LEXIS 3081 (S.D. Ohio Jan. 12,
   2015) ................................................................................................................13

*Johnson v. Griffin*,
   *85 F.4th 429, 433 (6th Cir. 2023)*..................................................................9, 10

*Kalemba v. Turk*,
  353 F. Supp. 1101 (N.D. Ohio 1973) ...................................................................18

*Lakin v. Rund*,
  318 Mich. App. 127 (2016) ................................................................................19

*Linebaugh v. Sheraton Michigan Corp.*,
  497 N.W.2d 585 (1993) ......................................................................................29

*Literati, LLC v. Literati, Inc.*,
  No. 20-12764, 2021 WL 1122209 (E.D. Mich. Mar. 24, 2021).........................28

*Margita v. Diamond Mortg. Corp.*,
  406 N.W.2d 268 (1987) ......................................................................................30

*Martin v. Stokes*,
  623 F.2d 469 (6th Cir. 1980) .............................................................................12

*McCracken v. Evening News Asso.*,
  3 Mich. App. 32, 141 N.W.2d 694 (1966).........................................................20

*McGhee v. Sanilac Cnty.*,
  934 F.2d 89 (6th Cir. 1991) ..............................................................................24

*Milkovich v. Lorain Journal Co.*,
  497 U.S. 1 (1990)................................................................................................22

*Mroz v. Lee*,
  5 F.3d 1016 (6th Cir. 1993) .........................................................................29, 30

*Mullenmeister v. Snap-On Tools Corp.*,
  587 F. Supp. 868 (S.D.N.Y. 1984) ...............................................................18, 23

*Nichols v. Moore*,
  396 F. Supp. 2d 783 (E.D. Mich. 2005) ............................................................20

*Northland Wheels Roller Skating Ctr. v. Detroit Free Press*,
  213 Mich. App. 317, 539 N.W.2d 774 (1995)....................................................20

*P.T. Today, Inc. v. Comm'r of Off. of Fin. & Ins. Servs.*,
  270 Mich. App. 110, 715 N.W.2d 398 (2006)....................................................27

*In re Packaged Ice Antitrust Litig.*,
    723 F. Supp. 2d 987 (E.D. Mich. 2010) ..................................................6

*Peffer v. Thompson*,
    754 F. App'x 316 (6th Cir. 2018) ........................................................26

*Porter v. City of Royal Oak*,
    542 N.W.2d 905 (Mich. Ct. App. 1995)................................................24

*Punturo v. Kern*,
    506 Mich. 1009, 951 N.W.2d 342 (2020) .........................................22

*Reed v Ponton*,
    15 Mich App 423, 166 NW2d 629 (1968)..........................................25

*Sawabini v. Desenberg*,
    372 N.W.2d 559 (1985) ......................................................................25

*State v. Heyen*,
    2020 UT App 147, 477 P.3d 23 (Ut. App. 2020) .............................18

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................19

*Estate of Thomson v. Toyota Motor Corp.*,
    545 F.3d 357 (6th Cir. 2008) ...............................................................6

*Trepel v. Pontiac Osteopathic Hosp.*,
    354 N.W.2d 341 (1984) ......................................................................28

*United States v. Foster*,
    No. 3:21-CR-000114-SLG-MMS, 2022 U.S. Dist. LEXIS 235371
    (D. Alaska Nov. 17, 2022) ..................................................................18

**Statutes**

18 U.S.C. § 247(c) ....................................................................................19

18 U.S.C. § 247(d)(5)................................................................................19

28 U.S.C. §§ 1406(a), 1631 .....................................................................12

§ 1406(a) ..................................................................................................12

**Other Authorities**

Fed. R. Evid. 201(b) .................................................................................19

Fed. R. Evid. 201(c)(2) ............................................................................19

MCL 600.2911(3) ....................................................................................21

Rule 12(b)(2) .............................................................................................6

Rule 12(b)(6) ...............................................................................14, 19, 30

# I.     **INTRODUCTION**

This case calls into focus the power that the internet gives a single person to devastate someone else's life using only words. Plaintiff John Druskinis is a 21-year-old college athlete who—like so many college students before him—did something stupid. In this case, he drank too much and painted an immature penis joke on a sidewalk. But he resolved the situation as any respectable student would do: by apologizing to those affected and making amends.

That is how the entire situation would have ended in any generation before this one, and how it would have ended here were it not for Defendant Liora Reznichenko. Once this self-appointed internet vigilante learned of the incident and that it occurred in front of a Jewish Resource Center, she took it upon herself to use her substantial online platform to ruin Druskinis' life. Not content with publicly connecting his name to the incident for the first time, she also apparently decided that the actual facts of the situation weren't damning enough. Instead of painting a penis on a sidewalk, Reznichenko told the world that Druskinis had painted a *swastika* onto a Jewish building. More than 3 million people viewed this social media post and Defendants' related publications. The outcry was immediate. Hundreds of news outlets around the country repeated the lie, with Druskinis' face and name attached to the story. He suffered in unimaginable ways, receiving death threats targeting him and his family, losing athletic and employment opportunities,

ruining friendships, and more. To this day, Druskinis finds himself mocked as "Swastika boy" by strangers. The only ones to blame: Defendants, who invented the story and published it online to target and destroy Druskinis.

As if this bottom-feeding behavior weren't unseemly enough, Reznichenko now seeks to defend herself from liability by arguing that an immature penis sketch and spray-painting the world's most notorious symbol of racial hate on a Jewish building are substantially the same thing. This transparently false suggestion defies common sense. That it is being made by a supposed crusader *against* antisemitism undercuts any credibility Reznichenko had left. The Court should deny her motion.

## II.   COUNTER-STATEMENT OF FACTS

### A.   The Parties

Plaintiff Druskinis is a 21-year-old student at the University of Michigan in Ann Arbor and a former member of the men's ice hockey team. (ECF No. 19, PgID 247, ¶ 10). Defendant Reznichenko is the executive director of Defendant SAO, a self-proclaimed and unincorporated "watchdog organization" with its principal place of business in Florida. (ECF No. 19, PgID 246, ¶¶ 3-5). Reznichenko appears to be SAO's only mouthpiece.[1] (ECF No. 19, PgID 247-48, ¶ 5). SAO primarily exists online with a purpose of "exposing groups and individuals" that "engage in antisemitic behaviors." (ECF No. 19, PgID 247-48, ¶ 11).

---

[1] For this reason, Reznichenko and SAO are used interchangeably.

2

**B.**   **SAO and Reznichenko Accuse Druskinis of Spray-Painting Swastikas**

On August 22, 2023, Druskinis drunkenly spray-painted a sketch of a penis along with the word "fag" on a sidewalk near the Jewish Resource Center in Ann Arbor. (ECF No. 19, PgID 248, ¶ 13). Another University of Michigan student, Megan Minturn, added her initials next to the sketch. Druskinis and Minturn publicly apologized to the Jewish Resource Center, which elected not to prosecute the incident. (ECF No. 19, PgID 248, ¶ 13). While embarrassed by his drunken conduct, Druskinis' life largely went on. Then, Reznichenko latched onto him.

On September 30, 2023, Reznichenko published a post on SAO's X.com (formerly Twitter) profile accusing Druskinis of "spray painting *swastikas*" onto the Jewish Resource Center in Ann Arbor. (ECF No. 19, PgID 248, ¶ 15) (emphasis added). The X.com post used the hashtag "#twitterhockey," tagged @umichhockey, the University of Michigan's official men's hockey team account, and thanked the hockey team for "creating actual consequences for antisemitism activity on [UM's] campus." (ECF No. 19, PgID 248-49, ¶ 16). Specifically, the post said:

> University of Michigan hockey has given Johnny Druskinis the boot after he was caught on camera spray painting swastikas onto the Jewish Resource Center during welcome week.
>
> Thank you @umichhockey for creating actual consequences for antisemitism activity on your campus. #twitterhockey

(ECF No. 19, PgID 248-49, ¶ 16).

3

Additionally, Reznichenko published an article on SAO's website titled, "University of Michigan Athlete Suspended for Antisemitic Graffiti at Jewish Resource Center." (ECF No. 19, PgID 249, ¶ 17). The article called on university leadership to "suspend or even expel this student …" (ECF No. 19, PgID 249, ¶ 19). She repeated these statements in a press release and in numerous media appearances, where she was quoted saying, "… if Michigan believed [Druskinis'] disgusting behavior warranted dismissal from the hockey team, they should seriously consider suspending or expelling him from the university." (ECF No. 19, PgID 248-49, ¶ 17). Reznichenko even tagged an article about Druskinis spray painting swastikas under her website's "Antisemitic Incident Map." (ECF No. 19, PgID 250, ¶ 23).

## C.   SAO and Reznichenko's False Stories Reach Millions

Druskinis' life turned into a living hell. Reznichenko's false X.com post was viewed by 3 million people. (ECF No. 19, PgID 251, ¶ 27). Millions more people viewed the false report about Druskinis on targeted media and Michigan media outlets, including Sports Illustrated, Fox News, Yahoo, and the Detroit Free Press. (ECF No. 19, PgID 251, ¶ 29). Death threats against Druskinis and his family started pouring in. (ECF No. 19, PgID 254, ¶ 43). He was confined to his own home. (ECF No. 19, PgID 254, ¶ 44). Druskinis watched countless friendships slip away, an opportunity to join a new university hockey team evaporated, his role as a volunteer youth hockey coach dissolved, and his public and digital footprint was ruined in

ways that will never fully recover.[2] (ECF No. 19, PgID 254-55, ¶ 44-45). Rabbi Mendy Klahr of the Jewish Resource Center came to Druskinis' defense and told media outlets that "there wasn't any swastikas," noting that "there's a difference between [what Druskinis drew] and a swastika." (ECF No. 19, PgID 253, ¶ 33). Yet, Reznichenko's damage was already done and far-reaching.

**D.    <u>Druskinis Files Lawsuit Against Reznichenko</u>**

On December 1, 2023, Druskinis filed a Verified Complaint and Jury Demand against SAO and Reznichenko. (ECF No. 1). Despite prior contact between Druskinis' counsel and Reznichenko's counsel, Reznichenko's counsel refused to accept service. (ECF No. 6, PgID 61). Reznichenko forced Druskinis to expend considerable resources in three different states to locate her, including retaining a private investigator and making nine attempts to serve her. (ECF No. 6, PgID 61). Instead of accepting service through her attorney, Reznichenko dodged service for weeks until this Court permitted alternate service. (ECF No. 7, PgID 150).

Rather than answer the Complaint, Reznichenko filed a motion to dismiss on March 5, 2024. (ECF No. 13). Thereafter, Druskinis filed a FAC on March 25, 2024. (ECF No. 19). The instant motion to dismiss followed. (ECF No. 23).

---

[2] Reznichenko's false story forced Druskinis to incur significant legal and public relations fees to attempt to correct media outlets that wrongly relied on Reznichenko's word.

## III.   ARGUMENT

**A.   This Court Has Personal Jurisdiction Because Defendants Intentionally and Specifically Targeted Michigan in Multiple Ways**

### 1.   Defendants' Failure to Submit Testimony Dooms Their Motion

"Plaintiffs bear the burden of establishing that personal jurisdiction exists. However, a plaintiff is only required to meet this burden when challenged by a motion under Rule 12(b)(2), which the moving defendant supports by attaching affidavits." *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1019 (E.D. Mich. 2010) (cleaned up). Where, as here, Defendants "ha[ve] not submitted any facts, by way of affidavit, which challenge Plaintiffs' factual allegations … the Court can properly rely on Plaintiffs' pleadings to resolve the 12(b)(2) motion." *Id.*

Indeed, courts view the pleadings and affidavits submitted in a light most favorable to the plaintiff, disregarding "the controverting assertions of the party seeking dismissal.'" *Estate of Thomson v. Toyota Motor Corp.*, 545 F.3d 357, 360-61 (6th Cir. 2008) (citations omitted). Plaintiff's burden is "relatively slight," and "the plaintiff must make only a prima facie showing that personal jurisdiction exists in order to defeat dismissal." *Id.* at 360. Druskinis' FAC is verified, which renders it admissible testimony that defeats Defendants' mere argument.

### 2.   Defendants Targeted This Forum and Caused Harm Here

Reznichenko tries to skirt jurisdiction by arguing that she did not "direct any action at Michigan." (ECF No. 23, PgID 336). While it is true that a defamatory

internet posting about a plaintiff, without more, is insufficient to hale the poster into the plaintiff's state, that is not the case here. Indeed, Reznichenko would have this Court believe that directly targeting and communicating defamatory statements about Druskinis with Michigan journalists and the University of Michigan is insufficient to create "minimum contacts" with Michigan. That misstates the law.

Specifically, the Sixth Circuit recognizes that something "more" is required to create personal jurisdiction for defamatory online posts, namely that a defendant "deliberately directed [a] message at an audience in the forum state and intended harm to the plaintiff occurring primarily or particularly in the forum state." *Blessing v. Chandrasekhar*, 988 F.3d 889, 905, n.15 (6th Cir. 2021) (citing *Shrader v. Biddinger*, 633 F.3d 1235, 1241 (10th Cir. 2011)). The effects of intentional torts may establish personal jurisdiction where the conduct is expressly aimed at the forum state. *Calder v. Jones*, 465 U.S. 783, 783 (1984).[3] As Druskinis alleges in his FAC, Reznichenko intentionally and specifically targeted Michigan in at least three ways, with the intent to cause harm in Michigan:

*First*, Reznichenko intentionally directed her communications at a Michigan audience by distributing a press release to numerous Michigan media outlets

---

[3] In sum, "a plaintiff can establish personal jurisdiction when it alleges that the defendant 'expressly aimed' tortious conduct at the forum in question and the 'brunt of the harm' is felt there." *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 451 (6th Cir. 2012) (quoting *Calder*, 465 U.S. at 788-89).

regarding Druskinis' alleged spray painting of swastikas.[4] (ECF No. 19, PgID. 250 ¶ 24). Reznichenko also targeted and communicated directly with Michigan media outlets, as she was extensively quoted in news articles blasting Druskinis' "disgusting behavior" and calling on the University of Michigan to suspend or expel him. (ECF No. 19, PgID. 250, ¶ 25).

*Second*, Reznichenko deliberately targeted and communicated with the University of Michigan and its hockey team, which are both located in Michigan. Reznichenko was quoted in the Michigan-based newspaper *Detroit Free Press* calling on the university's leadership to "seriously consider suspending or expelling [Druskinis]" because of his "disgusting behavior" (i.e., his alleged spray painting of swastikas). (ECF No. 19, PgID. 250, ¶ 25). Further, Reznichenko with deliberate intent tagged @umichhockey—the university hockey team's official X.com profile—to "thank" the team for "creating actual consequences for antisemitic activity …" (ECF No. 19, PgID. 248-49, ¶ 16). By directly and indirectly communicating with the University of Michigan, Reznichenko sought to interfere in the enrollment contract between Druskinis and the university, which were being performed in Michigan.

---

[4] Many of the media outlets that relied on Reznichenko as a source for the false statement that Druskinis "spray painted swastikas" later retracted their stories after Druskinis' counsel contacted them. (ECF No. 19, PgID. 254, ¶ 42).

*Third*, it is indisputable that the "brunt of the harm," *Calder*, 465 U.S. at 788-89, was felt in Michigan. Druskinis was the sole target of Defendants' publications, and Defendants themselves identified him as someone who resided and played hockey in Michigan. These facts are materially identical to those of *Calder* itself, in which a unanimous Supreme Court upheld the exercise of personal jurisdiction in California over an out-of-state magazine author who accused the plaintiff of alcoholism, on the grounds that the injury to her career would be felt in California.

### 3.   Defendants' Own Case Citations Establish Jurisdiction Here

Druskinis does not dispute that the two recent Sixth Circuit cases—*Blessing v. Chandrasekhar* and *Johnson v. Griffin*—are instructive. Indeed, Reznichenko's actions are analogous to *Johnson v. Griffin*, where the Sixth Circuit determined that celebrity comedian Kathy Griffin had sufficient minimum contacts with Tennessee to allow a federal district court to exercise specific personal jurisdiction over her. 85 F.4th 429, 433 (6th Cir. 2023). Specifically, Griffin published a series of tweets about a Tennessee-based CEO's alleged homophobic conduct. *Id.* at 431. The *Griffin* Court reasoned that Griffin's tweets concerned the Tennessee activities of a Tennessee resident and impugned the professionalism of an executive whose career was based in Tennessee. Further, the Court found that Griffin intended that the "brunt of the harm" would be felt in Tennessee, especially where she urged her

Twitter followers to pressure a Tennessee-based company to fire and remove the executive from a corporate board. *Id.* at 433.

Here, Reznichenko's conduct goes even further than Griffin where she not only published statements that concerned Druskinis, a Michigan resident, and impugned his reputation by accusing him of being an antisemite who spray painted swastikas at a Jewish center, she went so far as to contact Michigan media outlets to ensure the "brunt of the harm" would be felt in Michigan. *Id.* She even called on University of Michigan officials to suspend or expel him from the university. As in *Griffin*, Reznichenko knew the "focal point" of her X.com post and her communications to journalists was in Michigan. *Id.*

Reznichenko argues that her statements were made to a "general audience." (ECF No. 23, PgID. 343). If that were the case, why did Reznichenko specifically tag the University of Michigan hockey team, send a press release to Michigan media outlets, and provide a statement to the *Detroit Free Press* calling on Druskinis to be suspended or expelled? (ECF No. 19, PgID. 249, ¶ 20). Further, Reznichenko says the University of Michigan "neither suspended nor expelled Plaintiff."[5] (ECF No. 23, PgID. 344). But that is irrelevant to the fact that Reznichenko intentionally sought and encouraged the university to do so.

---

[5] She also misses the irony here. Of course the university refrained from suspending or expelling Druskinis for painting swastikas, because, unlike Reznichenko, the university *investigated* and determined that he did no such thing.

Finally, Reznichenko points to *Blessing v. Chandrasekhar* for the assertion that "missing here are allegations that Defendants intentionally targeted the forum state and directly communicated with any forum resident." (ECF No. 23, PgID. 344). Not so. To the contrary, Plaintiff makes numerous allegations about how Reznichenko intentionally targeted the University of Michigan, tagged the university (i.e., "[t]hank you @umichhockey"), contacted Michigan journalists, was quoted in at least one Detroit newspaper, and pushed for the University of Michigan to expel or suspend him. (ECF No. 19, PgID. 249-50, ¶¶ 16, 19, 24). The *Blessing* facts are distinguishable from this case where no communications were directed at the forum state. 988 F.3d at 905. In fact, *Blessing* proves Druskinis' argument correct where the Court in that case found "no affirmative steps to direct any communications" to the forum state. *Id.* at 906.

Importantly, if Reznichenko ventured to Michigan and unleashed identical accusations against Druskinis with the intention of tarnishing his reputation and subjecting him to public humiliation, the Court would have little trouble finding sufficient minimum contacts to satisfy personal jurisdiction. Yet here, Reznichenko opted to hide behind a computer screen while wielding the *same* targeted remarks, inflicting the *same* damages, and yielding the *same* consequences as if she was physically present on Michigan soil. This Court has personal jurisdiction over SAO and Reznichenko.

11

**4.     Alternatively, the Court Should Order Jurisdictional Discovery
and Transfer the Case to Florida**

It has long been the law that a district court should transfer a case when venue
is improper in the original forum if doing so is in the interest of justice, even if the
district court lacks personal jurisdiction over one or more of the defendants. *See* 28
U.S.C. §§ 1406(a), 1631. The Supreme Court in *Goldlawr, Inc. v. Heiman*, 369 U.S.
463 (1962) held that congressional intent in adopting § 1406(a) included a
recognition that the interest of justice may require the transfer of a complaint so that
a plaintiff would not be penalized by "justice-defeating technicalities." *Id*. at 466-
67. "The law in this Circuit, therefore, is that § 1406(a) provides the basis for any
transfer made for the purpose of avoiding an obstacle to adjudication on the merits
in the district court where the action was originally brought." *Martin v. Stokes*, 623
F.2d 469, 473-74 (6th Cir. 1980). "Inability to perfect service of process on a
defendant in an otherwise correct venue is such an obstacle." *Dubin v. United States*,
380 F.2d 813, 815 (5th Cir. 1967).

Here, if the Court find it lacks personal jurisdiction over Defendants, it should
transfer the case. Druskinis' assertion of jurisdiction here, even if the Court disagrees
with it, was done in good faith and with substantial case law support, for all the
reasons explained above. Further, Druskinis' defamation claim is subject to a one-
year statute of limitations. Although equitable tolling arguments are available, it
would be contrary to the interests of justice to put Druskinis at risk of a procedural

default by dismissing the case rather than allowing his claims to be adjudicated on the merits.[6] Justice especially favors this outcome here, where the Court has already found that Druskinis was unable to serve process on Reznichenko for months despite extensive efforts to do so in three different states. (ECF No. 6, PgID 60-61). She has even gone to such lengths as to advertise false addresses that turn out to be empty buildings. (ECF No. 6, PgID 66). Therefore, seeking alternate service through this action was Druskinis' only remaining recourse for adjudicating his claims. He should not be penalized for Reznichenko's justice-defeating evasions.

If the Court chooses this course, it should also order jurisdictional discovery to determine the correct district to transfer to. Plaintiffs allege that Reznichenko lives in Hollywood, Florida, which is in the Southern District. Her motion labels her a Florida resident, but does not specify a district, and she was never physically served.[7]

---

[6] *See*, *e.g.*, *JM-Nipponkoa Ins. Co. v. Dove Transp., LLC*, No. 1:14-cv-202, 2015 U.S. Dist. LEXIS 3081, at *15-17 (S.D. Ohio Jan. 12, 2015) (transferring venue at plaintiff's request, made in response to motion to dismiss for lack of personal jurisdiction, where "Plaintiffs argue that they are facing the expiration of a statute of limitations on their claim against Dove, and that dismissing the action rather than transferring it would risk the loss of their claim.")

[7] Transfer to the Southern District of Florida would still be proper without discovery, however. *See JM-Nipponkoa*, 2015 US Dist. LEXIS 3081 at *16-17 ("Whether the transferee court might ultimately conclude that a different venue is proper is not before this Court at this time.")

**B.     Druskinis' Defamation Claim Stands, Because Reznichenko's Lies
        Injured His Reputation Materially More Than the Truth Would Have**

**1.     The _Iqbal_ "Common Sense" Standard**

To survive a Rule 12(b)(6) motion, the complaint must "contain[ ] sufficient

factual matter, accepted as true, to state a claim to relief that is plausible on its face*."*

*Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). A claim is facially plausible when the

nonmoving party pleads facts that "allow[ ] the court to draw the reasonable

inference that the [moving party] is liable for the misconduct alleged. *Id*. at 678.

Ultimately, "determining whether a complaint states a plausible claim for relief will

... be a context-specific task that requires the reviewing court to draw on its judicial

experience and common sense." *Id.* at 679.

**2.     Reznichenko's Statements Were Not Substantially True**

According to Reznichenko's motion, an immature collegiate joke that

happens to occur near a Jewish building and intentionally terrorizing a Jewish

community with the world's most powerful symbol of racial hate are basically the

same thing. That assertion defies the common sense *Iqbal* requires courts to apply

to 12(b)(6) motions. An immature sidewalk sketch and tagging a building with a

swastika are not even remotely close to being equivalent. At the very least, they

cannot be found to be so as a matter of law before any discovery is taken.

Reznichenko published to the world that Druskinis "was caught on camera

spray painting swastikas onto the Jewish Resource Center," and he was "graffitiing

14

antisemitic … messages on the sidewalk in front of the campus' Jewish Resource Center."[8] (FAC, ECF No. 19, PgID 4-5, ¶¶ 16-18). Her motion does not (and could not) argue these statements were true. Rather she calls them "substantially true" based on two, and only two, facts: "Plaintiff spray-painted the word 'fag' and an image of ejaculating genitalia on the Center's sidewalk." (ECF No. 23, PgID 348).

Reznichenko does get the applicable legal standard mostly[9] correct. In order to be considered "substantially true" as a matter of law, her statement must have the same "gist" or "sting" as the true facts do, and "is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced." (ECF No. 23, PgID 347, citations omitted).

But to assert that an immature sidewalk penis sketch produces the same effect on the minds of viewers as a swastika emblazoned on a Jewish congregation's building is nonsense and betrays a fundamental ignorance of what a swastika represents. No one is in a better position to describe the reactions of those inside this particular Jewish Resource Center than the rabbi of that very congregation—and he has made this very distinction. Quoted days after this incident, Rabbi Mendy Klahr

---

[8] For the avoidance of doubt, this latter statement constitutes one of the statements alleged by the Complaint to be actionable defamation.

[9] Defendants insert a new footnote asserting that Druskinis is a "limited purpose public figure" who is required to show actual malice. (ECF No. 23, PgID 347, n.6). Not only does this assertion fail because Defendants offer no analysis to support it, but Druskinis addresses actual malice below in his discussion of the false light claim.

explained why the firestorm of news coverage sparked by Reznichenko's lies was

materially unfounded and unfair to Druskinis:

> And I see articles, and it's a little bit taken out of context because there wasn't any swastikas or anything like that. I'm not taking away from what they did. It was homophobic and a terrible drawing. *But there's a difference between that and a swastika*.[10]

There are profound, self-evident reasons that the swastika is an exceptional

expression of hatred that stands apart from all other offensive symbols. The Anti-

Defamation League, the country's most recognizable advocates for the Jewish

people, writes that, "Since 1945, the swastika has served as the most significant and

notorious of hate symbols, anti-Semitism and white supremacy for most of the world

… In the United States, the swastika is overwhelmingly viewed as a hate symbol."[11]

Indeed, "[i]n the Jewish experience, there is no more devastating and hurtful symbol

than the Nazi symbol."[12] "Even today racist neo-nazi gangs use the sign to desecrate

---

[10] Ryan Zuke, *Michigan athletes involved in Ann Arbor Jewish center vandalism have apologized, says rabbi,* MLIVE, Oct. 5, 2023, https://www.mlive.com/wolverines/2023/10/michigan-athletes-involved-in-ann-arbor-jewish-center-vandalism-have-apologized-says-rabbi.html (emphasis added) (ECF 19-6, PgID 290-92).

[11] Swastika, ANTI-DEFAMATION LEAGUE, https://www.adl.org/resources/hate-symbol/swastika (last visited May 10, 2024) (**Ex. 1**).

[12] *The Swastika: Use and Abuse of a Sacred Symbol*, AM. JEWISH COMM. (2021) https://www.hinduamerican.org/wp-content/uploads/2021/09/HAFN_21_023-SwastikaBrochure_r9-reader.pdf (**Ex. 2**).

Jewish graves or houses of worship. Some people feel that its taboo status has enhanced its appeal for hate groups."[13]

Steven Heller, journalist for the *New York Times Book Review* and co-chair of the MFA Designer as Author Department and Special Consultant to the President of New York's School of Visual Arts,[14] explored the swastika's unique power in the book *The Swastika and Symbols of Hate: Extremist Iconography Today* (Allworth Press, 2019). There, he writes:

> The Nazi swastika is a visual obscenity. Once the mark of good fortune, during the twentieth century it was hijacked and perverted, twisted into the graphic embodiment of intolerance. *If you want to know what the logo for hate looks like, go no further.* * * *
>
> How did the swastika leave such a scar on the human race? After all, there were other graphic marks that represent(ed) terror, but *none are today as indelible as the swastika.* * * *
>
> After all, *it is one of the most visually powerful symbols ever devised.* Just set aside for a moment what has tarnished it and compare the swastika to other great signs of the past and present: No other mark— not even variations of the cross or, for that matter, the Nike swoosh— are as graphically potent. * *. *
>
> *Today, simply uttering the word "swastika" evokes revulsion, indeed terror, in many.* * * *
>
> The swastika was indeed such a potent Nazi and national emblem that even nearly seventy-five years after the defeat of the Third Reich, it still

---

[13] *See* Kalpana Sunder, *The ancient symbol that was hijacked by evil*, BBC (Aug. 16, 2021), https://www.bbc.com/culture/article/20210816-the-ancient-symbol-that-was-hijacked-by-evil (**Ex. 3**).

[14] *See About Steven Heller*, HELLER BOOKS, https://www.hellerbooks.com/docs/about.html (last visited May 9, 2024) (**Ex. 4**).

instills fear and loathing. So enduring is its legacy and, therefore, so offensive is its metaphor that the German government, at the behest of the World War II allies, continues to officially ban all public displays of it. The swastika concentrates such vehemence in its very form that its horror is palpable even in current neo-fascist marks where mere fragments of the swastika are introduced. In fact, *the swastika is not simply a vivid reminder of a mournful history; it is an instrument (or at least an accessory) of its depravity*.[15]

Courts across the United States have echoed these observations.[16] Some courts have also gone farther, finding that falsely associating a person with a swastika specifically, and the hateful ideas it represents, can be defamatory. *See Mullenmeister v. Snap-On Tools Corp.*, 587 F. Supp. 868, 874 (S.D.N.Y. 1984) (collecting cases). By contrast, the word "fag" may be distasteful and generally offensive, but is several orders of magnitude less so than a swastika.[17] Based on these

---

[15] Kindle pp. 12, 14, 23, 24, 28 (emphasis added) (excerpts attached as **Ex. 5**).

[16] *See*, *e.g*., *Dickinson v. Austin*, 942 F.2d 791 (9th Cir. 1991) ("Regardless of its ancient or historic origins, the swastika today is a potent symbol of intolerance, hatred, and violence"); *United States v. Foster*, No. 3:21-CR-000114-SLG-MMS, 2022 U.S. Dist. LEXIS 235371, at *2-3 (D. Alaska Nov. 17, 2022) ("A lasting symbol of the Nazi regime has been the swastika" (citing the ADL and *Dickinson*); *Mullenmeister v. Snap-On Tools Corp.*, 587 F. Supp. 868, 873-74 (S.D.N.Y. 1984) ("The harsh experiences of the Second World War transformed the swastika into the universally recognized symbol of Hitler and his Nazis"); *Kalemba v. Turk*, 353 F. Supp. 1101, 1104 (N.D. Ohio 1973) ("There is little doubt that the swastika symbol represents values which are abhorred in the nation as a whole"); *State v. Heyen*, 2020 UT App 147, ¶ 9 n.3, 477 P.3d 23, 25 (Ut. App. 2020) (""Since 1945, the swastika has served as the most significant and notorious of hate symbols, anti-Semitism and white supremacy…. In the United States, the swastika is overwhelmingly viewed as a hate symbol" (quoting the ADL)).

[17] For example, a gay Stanford linguist writing in *Out* magazine conceded that "It's not one of your hard-core taboo words." **Ex. 7**, available at https://web.stanford.edu/~zwicky/the-other-f-word.pdf. The word is "'minor-league

18

(judicially noticeable[18] and common-sense) observations alone, the Court cannot hold as a matter of law that Reznichenko's statements linking Druskinis to swastikas or other antisemitic messages were substantially true.[19]

### 3.   <u>The Statements Are Not a Fair Report</u>

Here too, merely quoting the applicable legal standard illustrates several reasons why the defense is not available here. First and foremost, even if Reznichenko's statements fairly reported the contents of the police report (which

---

dirty,' 'rude,' 'not for polite company,' and a fair number of gay men are offended by [it].... You can say or print *faggot* or *fag* in public. Sometimes." *Id*. at 82.

[18] In addition to the allegations of the Complaint, the Court "must [also] consider ... other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322-23 (2007). "The court must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). A fact may be judicially noticed if it "is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). This documentation about the history and power of swastikas cannot be reasonably disputed and is subject to judicial notice.

[19] Defendants argue that penises and swastikas are legally equivalent because both "*could* be prosecuted as a violation of the [Church Arson Prevention] Act." (ECF No. 23, PgID 350, emphasis original). Not so. That statute only applies to actions taken "because of the race, color, or ethnic characteristics of any individual associated with that religious property." 18 U.S.C. § 247(c). Reading the record in the light most favorable to Druskinis, he was too intoxicated to realize the building was associated with Judaism. (ECF 23-3, PgID 379-80). Further, while Defendants are correct that the "*per se*" nature of the defamation is irrelevant here, Druskinis' petty vandalism is, at most, a misdemeanor under the Act, *see* 18 U.S.C. § 247(d)(5), and is therefore materially different than a *per se* defamatory accusation of criminal behavior *See Lakin v. Rund*, 318 Mich. App. 127, 140-41 (2016).

19

they do not), the statements never purported to be reporting on, or drawn from, that document. Her motion does not state or provide evidence that Reznichenko was even aware of the police report when she made her statements, and discovery will show that she was not. It is not enough for a defendant to discover a document after the fact that arguably supports her defamatory statement. As a matter of law, the fair report defense is not available when the statements were not actually gleaned from the document. *See Northland Wheels Roller Skating Ctr. v. Detroit Free Press*, 213 Mich. App. 317, 328, 539 N.W.2d 774, 779-80 (1995) ("this statement in defendant Free Press' article is not afforded protection under the fair reporting statute because it was not gleaned from police records about the shooting").[20]

Second, Reznichenko's statements are not a substantially accurate reflection of the police report. As her motion says, this defense is governed by "the same substantial truth analysis as … above." (ECF No. 23, PgID 352). But for the same

---

[20] The cases Defendants cite for the first time in their renewed motion do not support their argument to the contrary. *McCracken v. Evening News Asso.*, 3 Mich. App. 32, 38, 141 N.W.2d 694, 697 (1966) merely holds that a reporter may rely "on the word of another as to the nature of the [public record]," *id.*, but that he publishes such hearsay "[a]t his risk, and at the risk of his publisher, ...[because] [i]f the information thus obtained and published does not substantially represent the matter contained in the court records, then the [fact] question arises as to whether or not the publisher has abused his privilege." *Id.* at 697-98. *Nichols v. Moore*, 396 F. Supp. 2d 783, 789 (E.D. Mich. 2005) merely (mis)applies this passage of *McCracken*, and as a federal decision, it is not authority as to what Michigan law is. Here, Defendants did not rely on the police report either directly or through another, and they got its contents wrong. *Northland Wheels*, decided almost 30 years after *McCracken*, clarifies that information not drawn from a public record cannot be a fair report.

reasons also outlined above, characterizing Druskinis' penis drawing as a swastika is not substantially true. And because the swastika reference was added to, rather than drawn from, the police report, that language is expressly excluded from the statutory fair reporting privilege by the statute itself.[21]

Neither can the police report support the reference to Druskinis painting "other antisemitic messages." The motion quotes a police officer acting on initial reports and characterizing letters painted nearby as the word "Jew." (ECF No. 23, PgID 352, quoting ECF No. 23-3, PgID 375). Yet the same report later reveals this word was *not written by Druskinis*—it was painted by Megan Minturn, who had "admitted her role … and advised she spray painted her initials on the sidewalk." (ECF No. 23-3, PgID 381). Reznichenko herself reported Megan's name (ECF No. 19-3, PgID 275), and the police report contains a photo demonstrating the letters to be "MEM"[22]—*not* "Jew." (ECF No. 23-3, PgID 381).

---

[21] MCL 600.2911(3) further provides:

> This privilege shall not apply to a libel which is contained in a matter added by a person concerned in the publication or contained in the report of anything said or done at the time and place of the public and official proceeding or governmental notice, announcement, written or recorded report or record generally available to the public, or act or action of a public body, which was not a part of the public and official proceeding or governmental notice, announcement, written or recorded report or record generally available to the public, or act or action of a public body.

[22] Minturn's full name is "Megan Elizabeth Minturn." See https://mgoblue.com/sports/womens-lacrosse/roster/megan-minturn/25219 (**Ex. 6**).

Third, "there are clues in and around [the statute] suggesting that the fair-reporting privilege is only enjoyed by media defendants," *Punturo v. Kern*, 506 Mich. 1009, 1011, 951 N.W.2d 342, 344 (2020) (Clement, J., concurring in denial of review), and not by self-appointed internet vigilantes like Reznichenko. *See id*. at 1014-15 (finding a "compelling" case that the privilege does not apply to individuals or "nontraditional journalism" online). As an unsettled question of Michigan law, the scope of this privilege is not ripe for resolution as a matter of law.

### 4.     The "Antisemitic" Comments Are Not Protected Opinion

Reznichenko's choice to label Drusinkis' words and actions "antisemitic" is actionable here not because they are debatable opinions, but because they stem from false assertions of fact. Yet again, Reznichenko's own recitation of the case law proves why it doesn't save her here. As she says, "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." (ECF No. 23, PgID 353, quoting *Milkovich v. Lorain Journal Co*., 497 U.S. 1, 20 (1990)). *Milkovich* expressly rejected "a wholesale defamation exemption for anything that might be labeled 'opinion,'… [recognizing] that that expressions of 'opinion' may often imply an assertion of objective fact." *Id*. at 19.

But a "provably false connotation" is precisely what Reznichenko's comments convey. She did not say, "I think painting a penis on a sidewalk owned

by the JRC is an antisemitic thing to do." Her X.com post said, "[Druskinis] was caught on camera spray painting swastikas," and that *this* was the "antisemitism activity" for which he was terminated from the University of Michigan team. (ECF No. 23, PgID 338). Her Article repeated these lies, citing both swastikas and other "antisemitic messages," *id.*, none of which—by her own concession—ever existed. Those are accusations of intimidation and terrorism. As Heller explained, "the swastika is not simply a vivid reminder of a mournful history; it is an instrument (or at least an accessory) of its depravity."[23] The "antisemite" conjured by Reznichenko's words is a hatemonger using the world's most powerful visual weapon to terrorize people based on their ethnicity. Yet the facts reveal the subject of her vitriol as merely a college kid too drunk to know what he was doing.[24]

Accordingly, "[c]ourts have readily held allegations of racism *and anti-Semitism* to constitute libel per se, at least *when founded on specific incidents*." *Mullenmeister v. Snap-On Tools Corp.*, 587 F. Supp. 868, 874 (S.D.N.Y. 1984) (collecting cases, emphasis added). The analysis is context-specific. This case could

---

[23] **Ex. 5** at 28.
[24] The police report on which Reznichenko now purports to rely belies even the subjective bigotry she argues is not susceptible to disproof. (ECF No. 23, PgID 351-52). The investigating officers recorded Druskinis' then-attorney as saying he "was very intoxicated at the time and does not remember anything." (ECF No. 23-3, PgID 379-80). Discovery will show that Druskinis did not even realize that the building was connected to Judaism at all—which is consistent with the already-admitted fact that his graffiti, while immature, had no racial component to it whatsoever.

not be less like the *Tannous* decision on which Reznichencko relies, in which she was vindicated for applying the "antisemitic" label to a professor who called Jews "Nazis" and advocated for the destruction of Israel. (*See* ECF No. 23, PgID 355-56). That was a protected expression of opinion concerning something that was actually said. This case, by contrast, involves her wielding the "antisemitic" label as shorthand for something Druskinis did not do and for "messages" he did not express.

## C.   Druskinis Has a Valid False Light Claim

Reznichenko is wrong to characterize this as a relabeled defamation claim. The tort of false-light invasion of privacy is a separate claim[25] which requires a showing that Reznichenko broadcast to the public in general, or to a large number of people, information that was unreasonable and highly objectionable by attributing to the Plaintiff's characteristics, conduct or beliefs that were false and placed the Plaintiff in a false position. *Porter v. City of Royal Oak*, 542 N.W.2d 905, 909 (Mich. Ct. App. 1995). Success on this claim does not hinge on Druskinis being defamed, even though he has been. Rather, "[i]t is enough that [Druskinis is] given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false, and so is placed before the public in a false

---

[25] *McGhee v. Sanilac Cnty.*, 934 F.2d 89, 94 (6th Cir. 1991) ("Michigan courts have repeatedly stated that a plaintiff need not be defamed to maintain a false light claim").

position." *Sawabini v. Desenberg*, 372 N.W.2d 559, 564 (1985). Reznichenko's recycled defamation defenses are as faulty here as they are above.

Here, Reznichenko placed Druskinis in a false light when she broadcast to over 3 million people on X.com alone, and millions more in her targeted national and Michigan media frenzy, that Druskinis spray-painted swastikas onto a Jewish center.[26] (ECF No. 19, PgID. 251, ¶¶ 27-29). Reznichenko "lift[ed] the curtain of privacy on a subject matter that a reasonable man of ordinary sensibilities would find offensive and objectionable." *Reed v Ponton*, 15 Mich App 423, 426, 166 NW2d 629 (1968). It should especially come as no surprise to Reznichenko—who runs a "watchdog organization" focused on combatting antisemitism—that a person of ordinary sensibilities would find an accusation as grave as spray-painting swastikas to be highly offensive and objectionable.

Next, Reznichenko argues that the "defacement of a Jewish cultural center" is a public, not a private matter. (ECF No. 23, PgID. 359-60). But such an argument is premised on accepting that such conduct was true. That is not—nor ever was—the subject matter of Reznichenko's statements, nor was it what occurred. Reznichenko specifically impugned Druskinis' reputation by claiming he spray-painted swastikas onto a Jewish center. (ECF No. 19, PgID. 248-49, ¶¶ 15-16). The only conceded

---

[26] This is not a situation where Reznichenko put Druskinis in a false light among a handful of people—this are verifiably millions of people who viewed Reznichenko's statements. (ECF No. 19, PgID. 251, ¶¶ 27-29).

truth is that Druskinis spray painted male genitalia and a slur on a sidewalk near a Jewish center. Reznichenko took multiple leaps to invent a narrative as grave as spray-painting swastikas on a religious building.

Separately, Reznichenko claims that Druskinis did not "adequately" plead actual malice. This is, again, not true. "[T]he defendant must have known of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff would be placed." *Peffer v. Thompson*, 754 F. App'x 316, 320 (6th Cir. 2018) (quoting *Detroit Free Press, Inc. v. Oakland Cnty. Sheriff*, 164 Mich. App. 656, 666, 418 N.W.2d 124, 128 (1987)). Here, Druskinis properly alleged actual malice in pleading that Reznichenko knew the "swastikas" statement to be false yet published it anyway with an express intent to "expose" him. (ECF No. 19, PgID. 262, ¶ 76). Further, Reznichenko performed zero diligence to investigate the accuracy of the "swastikas" statements, and when she was corrected, failed to meaningfully retract or apologize for her statements. (ECF No. 19, PgID. 262, ¶ 75). Druskinis has a viable claim for false light invasion of privacy.

### D.   Druskinis Has Pled Sufficient Facts for Tortious Interference Claim

Reznichenko suggests that when she made the false statements about Druskinis, she was unaware of any business expectancies. (ECF No. 23, PgID. 363). Yet, Reznichenko's own statements indicating that "[r]emoval from the hockey team is not enough …" is indicative of the fact that she knew he had other business

26

expectancies. (ECF No. 19, PgID. 249, ¶ 19). Moreover, Reznichenko called on University of Michigan leadership to suspend or expel Druskinis from the university. (ECF No. 19, PgID. 249, ¶¶ 19-20). She even used the hashtag "#twitterhockey" to ensure her post would be viewed by influencers in the hockey community. (ECF No. 19, PgID. 248-49, ¶ 16). Reznichenko knew Druskinis was a 21-year-old rising hockey star and she engineered a narrative aimed at capturing maximum attention and rendering any prospects of him joining another team dead on arrival.

The elements of tortious interference with a business relationship or expectancy are: "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy by the interferer, (3) an intentional and wrongful interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage to the party whose relationship or expectancy was disrupted." *P.T. Today, Inc. v. Comm'r of Off. of Fin. & Ins. Servs*., 270 Mich. App. 110, 148, 715 N.W.2d 398, 422 (2006). Druskinis pleads sufficient facts that Reznichenko knew that Druskinis had opportunities to play for other college hockey teams, intended to interfere and sabotage these opportunities, and in fact succeeded where he lost out on a relationship. (ECF No. 19, PgID. 264, ¶¶ 87, 88, 90). Reznichenko cites to two unpublished cases for her argument that Druskinis was required to plead something more to make a colorable claim for tortious interference of a business expectancy. (ECF No. 23, PgID. 362). But both of

27

Reznichenko's unpublished cases involve blanket claims for tortious interference, which is not the case here.

Namely, in *Endoscopy Corp. of Am. v. Kenaan*, No. 359398, 2023 WL 2439487, at *4 (Mich. Ct. App. Mar. 9, 2023), the Court found that the plaintiff merely pled a legal conclusion without identifying specific relationships or expectancies. This is different than Druskinis' case where Druskinis pointed to a specific relationship (*i.e.*, a youth hockey team)[27] and a specific expectancy (*i.e.*, a college team). (ECF No. 19, PgID. 263-64, ¶¶ 81, 87, 89). Similarly, in *Literati, LLC v. Literati, Inc*., No. 20-12764, 2021 WL 1122209, at *3 (E.D. Mich. Mar. 24, 2021), the Court took issue with the plaintiff's blanket assertions about anonymous customers. Again, this is different than here where Druskinis articulates specific expectancies that he lost due to Reznichenko's statements. Reznichenko cannot point to any authority requiring the precise name of the teams in the FAC; rather, the law only requires Druskinis plead specific facts that show a "reasonable likelihood or probability, not mere wishful thinking," of a valid business expectancy." *Trepel v. Pontiac Osteopathic Hosp*., 354 N.W.2d 341, 348 (1984). Druskinis has done so.

---

[27] Reznichenko's argument that Druskinis' loss of a volunteer position entails no pecuniary loss disregards the business relationships that arise from such positions.

**E.**     <u>**Druskinis Has Viable Intentional Infliction of Emotional Distress Claim**</u>

Reznichenko contends it is a stretch to claim a person who, one day, is an ordinary University of Michigan student, and the next day is receiving death threats and appearing on national media outlets such as Fox News and Sports Illustrated being labeled antisemitic and accused of spray painting swastikas is extreme and outrageous. Druskinis recognizes the high threshold for demonstrating "extreme and outrageous" conduct. On these facts, however, a jury could reasonably conclude Reznichenko exceeded all bounds of decency. *See Armstrong v. Shirvell*, 596 F. App'x 433, 452 (6th Cir. 2015) (IIED claim should be submitted to the jury where reasonable minds could find defendant's conduct extreme and outrageous).

The elements of intentional infliction of emotional distress (IIED) are: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. *Linebaugh v. Sheraton Michigan Corp*., 497 N.W.2d 585, 588 (1993). Courts look to the "context of the alleged conduct, to the totality of the circumstances," namely, whether it "might cause an average member of the community to exclaim, 'Outrageous!'" *Mroz v. Lee*, 5 F.3d 1016, 1019-20 (6th Cir. 1993). Here, a jury could very well find that Reznichenko's conduct extends well beyond "mere insults, indignities, threats, annoyances, petty impressions [and] or other trivialities." *Id*. Specifically, Druskinis pled Defendants falsely accused him of a hate crime and spread the false report as wide as possible to subject him to death

threats and harassment. (ECF No. 19, PgID. 263-64, ¶¶ 81, 87, 89). Reznichenko

tries to hide behind a claim that her false and defamatory speech was in the "public

interest," but she fails to recognize "[t]he First Amendment does not serve as a

complete defense." *Armstrong*, 596 F. App'x at 453 Courts have left IIED claims

with a jury for less egregious facts.[28] Druskinis' claim should be left for the jury.

## IV.  <u>CONCLUSION</u>

For all of the foregoing reasons, Plaintiff respectfully requests that the Court

deny Defendants' motion to dismiss. Alternatively, to the extent the Court would

otherwise be inclined to dismiss any claim under Rule 12(b)(6), Plaintiff requests

the opportunity to file an amended complaint to resolve any deficiency in pleading.

Respectfully submitted,

WARNER NORCROSS + JUDD LLP

Dated: May 13, 2024           /s/ Brian D. Wassom
                              Brian D. Wassom (P60381)
                              Charles C. Kadado (P86279)
                              12900 Hall Road, Suite 200
                              Sterling Heights, Michigan 48313
                              (586) 303-4100
                              bwassom@wnj.com
                              ckadado@wnj.com

                              *Attorneys for Plaintiff*

---

[28] *Mroz*, 5 F.3d at 1020 (collecting cases); *see also Margita v. Diamond Mortg. Corp.*, 406 N.W.2d 268, 272 (1987) (whether harassing phone calls was extreme and outrageous was a question for the trier of fact); *Atkinson v. Farley*, 431 N.W.2d 95, 98 (1988) (whether harassment by insurer threatening to terminate benefits was properly submitted for the jury).

## <u>CERTIFICATE OF SERVICE</u>

Denise Keilch states that on May 13, 2024, she caused to be served the foregoing document and this Certificate of Service via the court's electronic filing system, which will send notification of such filing to all attorneys on record.

I declare that the above statement is true to the best of my knowledge, information and belief.

*/s/ Denise Keilch*
Denise Keilch