UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DRUSKINIS,

          Plaintiff,                    Case No. 2:23-cv-13046

v.                                  Honorable Susan K. DeClercq
                                  United States District Judge
STOPANTISEMITISM and
LIORA REZNICHENKO

          Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS (ECF No. 23)**

In 2023, John Druskinis was a student-athlete on the University of Michigan's ice hockey team. That August, he spraypainted a picture of an ejaculating penis and the slur "fag" on the sidewalk leading up to the Jewish Resource Center in Ann Arbor. As a result, he was kicked off the hockey team, and he later publicly apologized for his actions. Soon after, StopAntisemitism, a watchdog organization that "exposes" people it views as engaging in antisemitic behavior, caught wind of the story. It posted on X.com (formerly Twitter) about what happened but got an important detail wrong: it reported that Druskinis had spraypainted onto the Jewish Resource Center not a penis or a homophobic slur, but swastikas.

Druskinis says that StopAntisemitism purposely and maliciously turned his life into a living hell through its false reporting. He therefore sued StopAntisemitism

and its executive director, Liora Reznichenko (collectively "StopAntisemitism") for defamation, false-light invasion of privacy, tortious interference with business relations, and intentional infliction of emotional distress. StopAntisemitism moved to dismiss, arguing first that it was not subject to personal jurisdiction in Michigan, and second that Druskinis failed to state any plausible claim.

As explained below, this Court may exercise personal jurisdiction over StopAntisemitism. As for the merits, most of Druskinis's claims fail except for the defamation claim, which survives only as related to the post that he spraypainted swastikas. Accordingly, the motion to dismiss will be granted in part and denied in part.

## I. BACKGROUND

The following factual allegations come from Druskinis's verified first amended complaint. ECF No. 19. At the motion-to-dismiss stage, they must be accepted as true, and all reasonable inferences must be drawn in Druskinis's favor. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008).

John Druskinis is a Michigan resident. *Id.* at PageID.246. He was a student at the University of Michigan and a member of the school's ice hockey team. *Id.* StopAntisemitism is an unincorporated association with its principal place of business in Florida. *Id.* It is a "grassroots watchdog organization" dedicated to "expos[ing] groups and individuals" that "engage in antisemitic behaviors." *Id.* at

PageID.247–48. Liora Reznichenko is a Florida resident and StopAntisemitism's executive director. *Id.* at PageID.246, 248.

Around 5:00 PM on Tuesday, August 22, 2023, Druskinis spraypainted a picture of an ejaculating penis and the slur "fag" on a sidewalk leading up to the Jewish Resource Center in Ann Arbor. *Id.* at PageID.248; ECF No. 19-6 at PageID.290. Security-camera footage showed Druskinis vandalizing the sidewalk, and the Ann Arbor Police made a report of the incident. *See* ECF No. 23-3 at PageID.370–85. On September 30, 2023, StopAntisemitism published a post on X.com (formerly Twitter) accusing Druskinis of "spray painting swastikas" onto the Jewish Resource Center in Ann Arbor. ECF No. 19 at PageID.248. The post used the hashtag "#twitterhockey," tagged @umichhockey (the official account of the University of Michigan's hockey team), and thanked the hockey team for "creating actual consequences for antisemitism activity on [the University's] campus." *Id.* at PageID.248–49. The post reads in full:

> University of Michigan hockey has given Johnny Druskinis the boot after he was caught on camera spray painting swastikas onto the Jewish Resource Center during welcome week.
>
> Thank you @umichhockey for creating actual consequences for antisemitism activity on your campus. #twitterhockey

*Id.*; ECF No. 19-2 at PageID.273. In reality, Druskinis did not and had never spraypainted any swastikas. ECF No. 19 at PageID.252.

Additionally, on October 2, 2023, StopAntisemitism published an article on its website titled "University of Michigan Athlete Suspended for Antisemitic Graffiti at Jewish Resource Center." ECF Nos. 19 at PageID.249; 19-3 at PageID.275–76. The article incorporated in full the swastikas post, and also included a screenshot of the security-camera footage of the incident from the Jewish Resource Center. *See* ECF No. 19-3 at PageID.275. The article also stated StopAntisemitism's position that "[r]emoval from the hockey team is not enough," and "the University of Michigan has a responsibility to either suspend or even expel [Druskinis] if they are truly serious about fighting bigotry." *Id.*

Additionally, StopAntisemitism featured a third-party article on its website of an "Antisemitic Incident Map" that included a red pin on Michigan with the headline "Michigan hockey player kicked off team after alleged antisemitic behavior." ECF No. 19-4 at PageID.279. StopAntisemitism also "prepared and distributed a press release" on the incident to various media outlets, including some in Michigan. ECF No. 19 at PageID.250.

For Druskinis, the fallout from StopAntisemitism's reporting was immediate and severe. The X.com post was viewed by at least 3 million people, and the article and map by thousands of others. *Id.* at PageID.251. The story spread to other sports-related and Michigan-centered media outlets like Sports Illustrated, Fox News, Yahoo, and the Detroit Free Press. *Id.* Druskinis lost friendships, a volunteer position with a youth hockey team, and opportunities to play college or professional hockey.

*Id.* at PageID.259–60. At least one college hockey team decided not to enter contracts with him based on StopAntisemitism's reporting. *Id.* at PageID.263. He received threatening messages and was essentially confined to his own home. *Id.* at PageID.254. He was called "swastika boy" while he was at a business in Royal Oak. *Id.* at PageID.255.

Druskinis sued StopAntisemitism on December 1, 2023, bringing claims of defamation, false-light invasion of privacy, tortious interference with business relations, and intentional infliction of emotional distress (IIED). ECF No. 1. StopAntisemitism filed a motion to dismiss for lack of personal jurisdiction and for failure to state a claim, ECF No. 23, which has been fully briefed, ECF Nos. 24; 25. The Court held a hearing on the motion on July 16, 2024.

## II. STANDARD OF REVIEW

Under Civil Rule 12(b)(6), a pleading fails to state a claim if its allegations do not support recovery under any recognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a Rule 12(b)(6) motion, the court accepts the complaint's factual allegations as true and draws all reasonable inferences in the plaintiff's favor. *See Lambert*, 517 F.3d at 439 (6th Cir. 2008). The plaintiff need not provide "detailed factual allegations" but must provide "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[A] formulaic recitation of the elements of a cause of action will not do."). The complaint is facially plausible if it "pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see also 16630 Southfield Ltd. v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 503 (6th Cir. 2013). If not, then the court must grant the motion to dismiss. *Winnett v. Caterpillar, Inc.*, 553 F.3d 1000, 1005 (6th Cir. 2009).

### III. DISCUSSION

### A. Personal Jurisdiction

StopAntisemitism first moves to dismiss for lack of personal jurisdiction under Civil Rule 12(b)(2). ECF No. 23 at PageID.340–45.

Plaintiffs bear the burden of establishing that personal jurisdiction exists over defendants. *Brunner v. Hampson*, 441 F.3d 457, 462 (6th Cir. 2006). However, because the Court relies only on written submissions to resolve this motion (as opposed to conducting an evidentiary hearing or limited discovery), that burden is "relatively slight." *Est. of Thomson ex rel. Est. of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 360–61 (6th Cir. 2008). A plaintiff need only "set forth specific facts" to support a prima facie showing that jurisdiction is proper. *Kroger Co. v. Malease Foods Corp.*, 437 F.3d 506, 510 (6th Cir. 2006).

In diversity cases like this one, federal courts start with state law to determine whether they have personal jurisdiction over a defendant. *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014); *see* FED. R. CIV. P. 4(k)(1)(A). Michigan's relevant long-arm statute permits limited personal jurisdiction over individuals who "do[] or caus[e] an act to be done, or consequences to occur, in the state resulting in an action

for tort." MICH. COMP. LAWS § 600.705(2). Because Druskinis brings tort claims for acts or consequences that allegedly occurred in Michigan, *see* ECF No. 19 at PageID.255–68, exercising jurisdiction here complies with the long-arm statute.

Next, courts consider whether exercising personal jurisdiction comports with the Due Process Clause of the United States Constitution. *Johnson v. Griffin*, 85 F.4th 429, 432 (6th Cir. 2023). Due process requires that the defendant have "minimum contacts with" the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quotation omitted). Although there is both "specific" jurisdiction arising out of case-related contacts and "general" jurisdiction arising out of "generic connections" to the forum, only specific jurisdiction is at issue here. *See Johnson*, 85 F.4th at 432. To possess specific jurisdiction over an out-of-state defendant, "the defendant's 'suit-related conduct' must show a 'substantial connection with the forum State.'" *Id.* (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014)).

Two Supreme Court cases "bookend" how personal jurisdiction applies to intentional torts like defamation. *Id.* at 433. (quoting *Power Invs., LLC v. SL EC, LLC*, 927 F.3d 914, 918 (6th Cir. 2019)). First, in *Calder v. Jones*, a California actress sued a Florida-based newspaper, reporter, and editor in California state court for publishing an allegedly libelous article about her. 465 U.S. 783, 784–85 (1984). The Supreme Court found that the California court's exercise of personal jurisdiction was

proper because the defendants' actions in Florida "were expressly aimed at California" and had "effects" in California. *Id.* at 789. Specifically, the story "concerned the California activities of a California resident" and drew upon "California sources." *Id.* at 788. The defendants also knew that the brunt of the reputational harm would be felt in California, where the actress lived and worked and where the newspaper had its largest circulation. *Id.* at 789–90. In effect, California was "the focal point both of the story and of the harm suffered." *Id.* at 789.

By contrast, in *Walden v. Fiore*, a Georgia police officer seized cash from Nevada professional gamblers while they were at the Atlanta airport. 571 U.S. at 279–80. The gamblers sued the officer in Nevada, but the Supreme Court found no personal jurisdiction. *Id.* at 281–82. Because all of the officer's actions took place in Georgia, the officer "had no jurisdictionally relevant contacts with Nevada"; he "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone into Nevada." *Id.* at 289. It did not matter that the plaintiff gamblers had strong connections with Nevada because plaintiffs cannot be the only thing connecting a defendant to the forum. *Id.* Rather, the personal-jurisdiction inquiry focuses on the how the *defendant's* own actions connect him to the forum. *Id.* at 290 ("the proper question . . . is whether the defendant's conduct connects him to the forum in any meaningful way").

Two Sixth Circuit cases that grapple with *Calder* and *Walden* are also instructive. Curiously, both of them concerned the conduct of comedian Kathy Griffin. First, in *Blessing v. Chandrasekhar*, Griffin posted online about a supposed confrontation between Kentucky high-school students and a Native American elder at the "March for Life" rally in Washington, D.C. 988 F.3d 889, 892 (6th Cir. 2021). Griffin's posts urged her followers to name and shame the students and to contact their Kentucky-based school. *Id.* at 893.

In response, the students sued Griffin in Kentucky, but the Sixth Circuit affirmed the dismissal for lack of personal jurisdiction. *Id.* at 892. The court reasoned that Griffin "took no affirmative steps" to communicate with a Kentucky audience specifically as opposed to an online audience generally, so the posts themselves created no contacts with the forum. *Id.* at 906. And like the officer in *Walden*, Griffin "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to" Kentucky. *Id.* (quoting *Walden*, 571 U.S. at 289). As the court later put it, "[m]issing in *Blessing* were allegations that Griffin had *intentionally targeted* Kentucky when provoking efforts to harass the students." *Johnson v. Griffin*, 85 F.4th 429, 434 (6th Cir. 2023) (emphasis added). It was also not enough for the students to allege that they suffered harm in Kentucky. As in *Walden*, the students suffered harm in Kentucky "not because anything independently occurred there," but because that is where they just happened to be located. *Id.* at 906–07 (quoting *Walden*, 571 U.S. at 290). Nor was Kentucky the "focal point . . . of the story," *Calder*, 465 U.S.

at 789, because the posts focused on events that happened in Washington, D.C. *Blessing*, 988 F.3d at 906.

By contrast, the Sixth Circuit found that a Tennessee court had personal jurisdiction over Griffin in *Johnson v. Griffin*, 85 F.4th 429 (6th Cir. 2023). There, Griffin posted about a Tennessee-based CEO of a Tennessee-based company, claiming that he engaged in homophobic conduct in Tennessee. Griffin suggested that her followers should make the CEO "online famous" and tagged his company in some of her posts, urging that he be removed from its board of directors. The company fired the CEO, who then sued in Tennessee.

The Sixth Circuit found personal jurisdiction, viewing the case more like *Calder* than *Walden*. Like in *Calder*, the allegedly tortious "story concerned the [Tennessee] activities of a [Tennessee] resident. It impugned the professionalism of [an executive] whose [ ] career was centered in [Tennessee]." *Johnson*, 85 F.4th at 433 (quoting *Calder*, 465 U.S. at 788) (alterations in original). Further, Griffin's posts "drew on a Tennessee source"—a video taken of the incident—"to attack a Tennessee resident for his conduct in Tennessee." *Id.* at 434 (citing *Calder*, 465 U.S. at 788–89). Thus, the Sixth Circuit reasoned, Griffin "undoubtedly knew" that Tennessee was the "focal point" of her posts. *Id.* at 433 (quoting *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 553 (6th Cir. 2007)). Because Griffin tagged the company in her posts, the court also found that she targeted a Tennessee audience specifically, not just an online audience generally. Though

- 10 -

Griffin also happened to send these posts "to every state in the country through her two million followers," that fact did not "inoculate [her] from personal jurisdiction in a targeted state." *Id.* at 435.

This case is more like *Calder* and *Johnson* than *Walden* and *Blessing*, so the Court may exercise personal jurisdiction over StopAntisemitism. As in *Calder*, the allegedly defamatory story here "concerned the [Michigan] activities of a [Michigan] resident. It impugned the professionalism of [a student athlete] whose [] career was centered in [Michigan]." 465 U.S. at 788. Further, StopAntisemitism's article "drew on a [Michigan] source"—the surveillance footage from the Jewish Resource Center. *Johnson*, 85 F.4th at 434; *see* ECF No. 19-3 at PageID.275 (discussing footage and embedding image from it into article). And because Druskinis's reputation is "centered" in Michigan (given his presence in the state), this is where he suffered the "brunt" of the alleged harm. *See Calder*, 465 U.S. at 789. Plainly, StopAntisemitism knew that Michigan would be "the focal point both of the story and of the harm suffered." *Id.*

StopAntisemitism responds that there is no personal jurisdiction because it did not specifically direct any communications to Michigan, but rather to a general audience. ECF No. 23 at PageID.343–44; *see Blessing*, 988 F.3d at 905 ("personal jurisdiction is absent when the communication was not specifically directed at the forum state"). However, StopAntisemitism tagged Michigan Hockey—a University of Michigan entity—in its X.com post, which counts as a direct communication with

the forum. *See Johnson*, 85 F.4th at 435 ("But [the defendant] cannot deny that, by tagging [the Tennessee company], she sent these communications directly to the company."). Namely, the tagging suggests that StopAntisemitism "intentionally cultivate[d]" contacts with Michigan, rather than those contacts being "random, fortuitous, or attenuated." *Johnson*, 85 F.4th at 432–33 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 465 (1985)).

Even so, StopAntisemitism resists this conclusion, arguing that the tagging was unrelated to any alleged injury and thus cannot confer personal jurisdiction. ECF No. 25 at PageID.466–67. This is unpersuasive because the tagging and alleged harm *are* related here; one cannot be untethered from the other. Recall that by bringing a defamation claim, Druskinis asserts harm to his reputation, caused mostly by StopAntisemitism's post about spraypainted swastikas. ECF No. 19 at PageID.259. Tagging Michigan Hockey in that post served to focus the reputational harm where it would matter most—in Michigan, and in the minds of those most likely to be invested in Michigan Hockey (like Michigan students, alumni, or the college hockey community). Indeed, Druskinis alleges as much. *See* ECF No. 19 at PageID.254–55, 259–60 (describing reputational harm suffered in Michigan). Given that the tagging may have amplified the degree of reputational harm that Druskinis suffered in Michigan, it counts as "suit-related conduct" supporting the exercise of jurisdiction. *Walden*, 571 U.S. at 284.

Although this conduct alone is enough to find personal jurisdiction, Druskinis offers two other examples of how StopAntisemitism "expressly aimed" its conduct at Michigan, both of which merit a brief discussion. First, Druskinis relies on a statement in StopAntisemitism's article that the University "has a responsibility to either suspend or even expel" him for his conduct. ECF No. 19-3 at PageID.275. Second, he alleges that StopAntisemitism distributed a press release to various Michigan media outlets "regarding Druskinis" and the incident. ECF No. 19 at PageID.250.

StopAntisemitism counters that these actions, even if intentional, cannot establish personal jurisdiction because they are not "suit-related"—that is, because neither was a tortious act. ECF No. 23 at PageID.344–45. StopAntisemitism notes that the University of Michigan neither suspended nor expelled Druskinis, and that Druskinis does not allege whether any defamatory statements actually appeared in the press release. *Id.*

These arguments seemingly touch on a question that has divided the circuits: "whether *Calder's* 'express aiming' inquiry includes *all* jurisdictionally relevant intentional acts of the defendant or only those acts that are intentional *and* alleged to be tortious or otherwise wrongful." *Tamburo v. Dworkin*, 601 F.3d 693, 704 (7th Cir. 2010) (detailing circuit split). Courts embracing the broader view—considering all of a defendant's intentional acts, wrongful or not—reason that it best avoids conflating the jurisdictional analysis with the merits, as *Calder* cautions against. *See,*

*e.g.*, *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1207–08 (9th Cir. 2006) (en banc) (per curiam); *Calder*, 465 U.S. at 1487–88. This view would certainly favor Druskinis. That is because it would not matter whether the University expelled Druskinis or what the press release said for purposes of the jurisdictional inquiry. All that would matter is whether StopAntisemitism intentionally directed these actions toward Michigan—a bar that the allegations easily clear.

As it happens, the Sixth Circuit has not yet expressly weighed in on which view it favors. But at least some language in the case law suggests that courts may consider both intentional tortious conduct *and* a party's other contacts with the forum, though this appeared in a context where the parties had a preexisting business relationship. *Air Prods.*, 503 F.3d at 552–53 ("the existence of intentional tortious conduct nonetheless 'enhances' a party's other contacts with the forum state for purposes of a purposeful availment analysis" (citing *Scotts Co. v. Aventis S.A.*, 145 F. App'x 109, 113 n.1 (6th Cir. 2005))). At the same time, other cases focus almost exclusively on intentional tortious conduct for the jurisdictional inquiry. *See Power Invs.*, 927 F.3d at 919; *Neal v. Janssen*, 270 F.3d 328, 332–33 (6th Cir. 2001) (finding personal jurisdiction based on fraudulent communications that formed the "heart" of plaintiff's claims).

In any event, this Court may "avoid entering this thicket." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1073 (10th Cir. 2008). That is because

- 14 -

even if *Calder* and *Walden* can be read as requiring "wrongful" intentional conduct, that conduct exists here: by tagging Michigan Hockey in a post about the Michigan activities of a Michigan resident, StopAntisemitism intentionally directed its allegedly tortious conduct at the forum. That is enough for the Court to exercise personal jurisdiction here.

### B. Merits of Plaintiff's Claims

StopAntisemitism next argues that all of Druskinis's counts—defamation, false-light invasion of privacy, tortious interference with business relations, and IIED—fail to state a claim upon which relief may be granted.

### 1. Defamation

Under Michigan law, a defamation claim requires: "(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication." *Edwards v. Detroit News, Inc.*, 910 N.W.2d 394, 400 (Mich. Ct. App. 2017) (citing *Lakin v. Rund*, 896 N.W.2d 76, 79 (Mich. Ct. App. 2016)).

Druskinis alleges at least six defamatory statements by StopAntisemitism:

- "University of Michigan hockey has given Johnny Druskinis the boot after he was caught on camera spray painting swastikas onto the Jewish Resource Center during welcome week. Thank you @umichhockey for creating actual consequences for antisemitism activity on your campus. . . ."

- 15 -

- "Druskinis was caught in the act of graffitiing the hateful messages in broad daylight by a surveillance camera on the property."

- "[Druskinis] has been suspended indefinitely from the school's men's hockey team for graffitiing antisemitic . . . messages on the sidewalk in front of the campus' Jewish Resource Center. . ."

- "The incident is the second reported act of antisemitism at the University of Michigan in the last few months."

- ". . .the University of Michigan has a responsibility to either suspend or even expel [Druskinis] if they are truly serious about fighting bigotry."

- "Michigan hockey player kicked off team after alleged antisemitic behavior."

ECF No. 19 at PageID.255–56. Only one of the statements (the X.com post) asserts as a fact that Druskinis spraypainted swastikas on the Jewish Resource Center. *Id.* The others refer to Druskinis's conduct as hateful or antisemitic. *Id.* StopAntisemitism argues that the defamation claim must be dismissed because (1) its reporting about spraypainting swastikas is substantially true and thus not actionable; (2) its statements are protected under Michigan's "fair report" privilege; and (3) its statements that Druskinis's conduct was antisemitic are non-actionable opinions. ECF No. 23 at PageID.346–58.

### a. Substantial Truth

StopAntisemitism effectively admits that, as a matter of literal fact, it was wrong about what Druskinis spraypainted that day. Even so, it argues that this error

- 16 -

is irrelevant because it got the gist of the story right—that is, because its reporting was "substantially true."

Courts do not hold media defendants to a standard of literal and absolute accuracy in every detail of their reporting. *Rouch v. Enquirer & News of Battle Creek Mich.*, 487 N.W.2d 205, 214 (Mich. 1992). Rather, a plaintiff may only pursue a defamation claim regarding statements that are "materially" false. *Id.* Therefore, if the "gist" or "sting" of the article is true, the plaintiff cannot prevail. *Fisher v. Detroit Free Press, Inc.*, 404 N.W.2d 765, 767–68 (Mich. Ct. App. 1987); *see also Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991) ("Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified. . . . Put another way, the statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced.") (internal quotations and citations omitted).

The parties spill a lot of ink over whether it is "substantially true" that Druskinis spraypainted swastikas. But these arguments are premature at the motion-to-dismiss stage, as neither party has had the chance to flesh out the facts during discovery.[1] What's more, the jury may ultimately have to resolve these arguments

---

[1] The Court acknowledges that at the July 16 motion hearing, StopAntisemitism argued that discovery would be neither helpful nor necessary to resolve this claim because all relevant facts are already known, and thus there is no outstanding discovery that would alter the substantial-truth analysis. If that is so, then perhaps StopAntisemitism's motion should have been one for summary judgment. But at the current procedural posture, the parties are entitled to the benefit of discovery.

because under Michigan law, substantial truth (or material falsity—they are two sides of the same coin) is normally a question of fact. *Chappelle Dev. Co. v. E. Lansing Info*, No. 359463, 2023 WL 2051187, at *4 (Mich. Ct. App. Feb. 16, 2023) (citing *Am. Transmission, Inc. v. Channel 7 of Detroit, Inc.*, 609 N.W.2d 607, 611 (Mich. Ct. App. 2000)); *see Collins v. Detroit Free Press, Inc.*, 627 N.W.2d 5, 9 (Mich. Ct. App. 2001) ("the question is whether, viewing the evidence in the light most favorable to the plaintiff, 'the published passages differ materially in meaning from the [plaintiff's] statements so as to create an issue of fact for a jury as to falsity.'" (quoting *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 521 (1991))). Of course, StopAntisemitism may argue at summary judgment that no reasonable jury could find its reporting materially different than what actually happened. But again, that is not a question for this Court to address at this stage.

### b. Fair Report Privilege

StopAntisemitism also argues that its statements are protected by Michigan's "fair report" privilege, which shields those that publish a "fair and true report of matters of public record" from defamation suits. MICH. COMP. LAWS § 600.2911(3). Namely, it argues that its post accurately reflected what was in the Ann Arbor Police Report because that report referred to "antisemitic graffiti." ECF No. 23 at PageID.351–53. But because there has been no discovery, it is currently unknown the extent to which StopAntisemitism relied on the police report in drafting its post—though the parties dispute whether such reliance is necessary for the privilege

to apply. Nonetheless, as both parties acknowledge, whether a report is "fair and true" under the statute turns on the same substantial-truth analysis discussed above in Section II.B.1.a. *See Northland Wheels Roller Skating Ctr. v. Detroit Free Press*, 539 N.W.2d 774, 778 (Mich. Ct. App.1995). That makes this argument one for summary judgment, too.

### c. Non-Actionable Opinion

Finally, StopAntisemitism argues that its statements calling Druskinis's conduct antisemitic are non-actionable opinions under the First Amendment. ECF No. 23 at PageID.353–58. Whether a statement is capable of carrying a defamatory meaning is a question of law. *Harris v. Bornhorst*, 513 F.3d 503, 522 (6th Cir. 2008) (quoting *Falls v. Sporting News Publ'g Co.*, 834 F.2d 611, 615–16 (6th Cir.1987)).

The First Amendment does not exempt everything that might be labeled an opinion from defamation liability. *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18 (1990). That is because opinions "may often imply an assertion of objective fact," which, if false, "can cause just as much damage to reputation" as simply stating the fact itself. *Id.* at 18–19. For instance, the statements "[i]n my opinion Jones is a liar" and "Jones is a liar" both imply knowledge of the fact that Jones lied, which, if false, would serve to damage Jones's reputation. *Id.* Even so, any "statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Id.* at 20. Put otherwise, such

an opinion "must be provable as false before there can be liability under state defamation law." *Id.* at 19–20.

Here, labeling Druskinis's conduct as antisemitic is a protected opinion because such a claim is not "provable as false." *Id.* at 19. Whatever biases or prejudices Druskinis may hold in his heart are not verifiable by the Court—or anyone else, for that matter. *See Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993). Nor does StopAntisemitism's opinion on antisemitism imply as an objective fact that Druskinis spraypainted swastikas. *See Milkovich*, 497 U.S. at 18–19. Borrowing the example from *Milkovich* confirms this: stating "in my opinion, Druskinis's conduct was antisemitic" does not necessarily imply that he spraypainted swastikas like stating "In my opinion, Jones is a liar" implies that Jones lied. *See id.* Even so, Druskinis attempts to link all of StopAntisemitism's opinions to the presence of a swastika, effectively arguing that the term "antisemitic" should be read to mean "swastika" each time it is used. ECF No. 24 at PageID.418–19. But this goes too far. The "antisemitism activity" to which StopAntisemitism refers could just as easily be the incident as a whole—namely, that spraypainting *anything negative* on the sidewalk leading up to the Jewish Resource Center is antisemitic. At the very least, reasonable people could disagree on that characterization. For instance, the Jewish Resource Center stated that although the vandalism "was offensive and disrespectful," it "did not include any overt anti-semitic symbols (like swastikas)." ECF No. 19-5 at PageID.288. But nothing prohibits StopAntisemitism

from expressing its own contrary opinion that the conduct was antisemitic. And there is no way for a judge or jury to definitively resolve that disagreement. There is no objective, underlying truth to root out, no way to prove that this opinion is false. At bottom, StopAntisemitism was free to interpret Druskinis's actions as antisemitic—swastikas or not. Accordingly, the defamation claim must be dismissed as to any opinions calling Druskinis's conduct antisemitic.

## 2. False-Light Invasion of Privacy

Druskinis also brings a claim for false-light invasion of privacy. In order to maintain such an action, "a plaintiff must show that the defendant broadcast to the public in general, or to a large number of people, information that was unreasonable and highly objectionable by attributing to the plaintiff characteristics, conduct, or beliefs that were false and placed the plaintiff in a false position." *Puetz v. Spectrum Health Hosps.*, 919 N.W.2d 439, 448 (Mich. Ct. App. 2018). A false-light claim requires that the "publicity must lift the curtain of privacy on a subject matter that a reasonable man of ordinary sensibilities would find offensive and objectionable: supersensitiveness is not protected." *Reed v. Ponton*, 166 N.W.2d 629, 630 (Mich. Ct. App. 1968).

Here, Druskinis's claim fails for a reason immediately clear from the name of the cause of action: there must be an invasion of a plaintiff's *privacy*, and no such thing happened here. *See Cetera v. Mileto*, 995 N.W.2d 838, 456–59 (Mich. Ct. App. 2022) (dismissing false-light claim because the speech at issue related to public, not

private lives of plaintiffs). Indisputably, Druskinis acted in public, so StopAntisemitism's reporting lifted no "curtain" on his private life. *See Reed*, 166 N.W.2d at 630. That is true regardless of whether StopAntisemitism got all the details about the incident right. *See Cetera*, 995 N.W.2d at 458–59 (recognizing that postings about public matters, "even if false and unreasonable," did not implicate plaintiff's privacy). Accordingly, Druskinis's false-light claim must be dismissed.

### 3. Tortious Interference With Business Relations

Druskinis also alleges that StopAntisemitism tortiously interfered with his business relationships or expectancies with hockey teams. ECF No. 19 at PageID.262–65. Specifically, Druskinis says that he was stripped of his volunteer position as a youth hockey coach and that he was denied opportunities to transfer to other college hockey teams, with one team deciding not to sign him after StopAntisemitism's post, when it otherwise would have. *Id.*

To state a claim for tortious interference with business relations, plaintiffs must allege: (1) a valid business relationship or expectancy; (2) the defendant's knowledge of the relationship or expectancy; (3) the defendant's intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resulting damage to the plaintiff. *Health Call v. Atrium Home & Health Serv., Inc.*, 706 N.W.2d 843, 848–49 (Mich. Ct. App. 2005).

Here, the tortious-interference claim is too attenuated to survive. First, it is unclear whether Druskinis had a valid *business* expectancy because he does not

allege whether he stood to gain financially from the prospect of transferring to play at another school. True enough, Druskinis says that "at least one college team [decided] against entering into contracts" with him, ECF No. 19 at PageID.263, but he fails to explain whether those contracts would have provided him with a scholarship, stipend, or other monetary benefit. For the same reason, his volunteer position with a youth hockey program does not count as a business relationship. Druskinis responds that losing the volunteer position could entail a monetary loss because such positions often lead to business relationships in the future. ECF No. 24 at PageID.424 n.27. But simply arguing that a relationship *might* lead to a business opportunity *later* is not concrete enough. *See Trepel v. Pontiac Osteopathic Hosp.*, 354 N.W.2d 341, 348 (1984) ("The expectancy must be a reasonable likelihood or probability, not mere wishful thinking.").

Druskinis also fails to adequately allege StopAntisemitism's knowledge of these specific relationships or expectancies. Druskinis claims that it is "common knowledge that college athletes often transfer to play at other schools, and that they frequently try out for and are selected to play on professional sports teams," and so StopAntisemitism "needed no further information to know that those options were reasonably available to Druskinis." ECF No. 19 at PageID.263. However, courts have required more than just knowledge of generalized business dealings, instead requiring knowledge of a specific business expectancy or relationship. *Varlesi v. Wayne State Univ.*, 909 F. Supp. 2d 827, 850 (E.D. Mich. 2012) (collecting cases);

*Literati, LLC v. Literati, Inc.*, 2021 WL 1122209, at *3 (E.D. Mich. Mar. 24, 2021) (dismissing tortious-interference claim because "[d]efendant's general knowledge of plaintiff's business does not equate to specific knowledge of plaintiff's business relations or expectancies."). The Court finds the reasoning of these cases persuasive and agrees, so the tortious-interference claim is dismissed.

### 4. Intentional Infliction of Emotional Distress (IIED)

Finally, Druskinis brings a claim for intentional infliction of emotional distress (IIED), which requires him to allege: "(1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff." *Lucas v. Awaad*, 830 N.W.2d 141, 150 (2013) (quoting *Dalley v. Dykema Gossett PLLC*, 788 N.W.2d 679, 694 (Mich. Ct. App. 2010)). Liability attaches "only when a plaintiff can demonstrate that the defendant's conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Dalley*, 788 N.W.2d at 694.

When a plaintiff's IIED claim is premised on the same statements as a defamation claim, the IIED claim is subject to the same First Amendment limitations as the defamation claim. *See Ireland v. Edwards*, 584 N.W.2d 632, 641 (Mich. Ct. App. 1998) (citing *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988)). The First Amendment may serve as a defense to IIED when the speech at issue touches on a matter of public concern. *Snyder v. Phelps*, 562 U.S. 443, 451–52 (2011)

(recognizing that "speech on matters of public concern is at the heart of the First Amendment's protection" (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758–59 (1985) (cleaned up))). Speech touches on a matter of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community," or when it "is a subject of legitimate news interests; that is, a subject of general interest and of value and concern to the public." *Snyder*, 472 U.S. at 453 (citations omitted).

Here, StopAntisemitism's speech clearly touches on a matter of public, not private, concern. The prevalence of antisemitism is a matter of political and social concern to the community, and the vandalism of the Jewish Resource Center's sidewalk is of legitimate news interest. *See Snyder*, 472 U.S. at 453. Druskinis's own allegations establish as much, describing how the story was picked up by numerous media outlets and spread like wildfire on the internet. *See* ECF No. 19 at PageID.251. For this reason, StopAntisemitism's speech is entitled to "special protection" under the First Amendment as related to the IIED claim,[2] and so the claim must be dismissed. *See Snyder*, 472 U.S. at 458.

---

[2] Note that this "special protection" does not necessarily extend to StopAntisemitism's allegedly *false* speech about the swastikas, which is why Druskinis's defamation claim may proceed. *See Brown v. Hartlage*, 456 U.S. 45, 60 (1982) ("Of course, demonstrable falsehoods are not protected by the First Amendment in the same manner as truthful statements."); *Kevorkian v. Am. Med. Ass'n*, 602 N.W.2d 233, 237 (Mich. Ct. App. 1999) ("Statements that are not protected [by the First Amendment] and therefore are actionable include false statements of fact, i.e., those that state actual facts but are objectively provable as

## IV. CONCLUSION

Accordingly, it is **ORDERED** that Defendants' Motion to Dismiss, ECF No.

23, is **GRANTED IN PART** and **DENIED IN PART**.

The Motion is **GRANTED** as to Count I (Defamation), **BUT ONLY** as related

to any opinions labeling Plaintiff's conduct as antisemitic; Count II (False Light

Invasion of Privacy); Count III (Tortious Interference with Business Relations); and

Count IV (Intentional Infliction of Emotional Distress). Accordingly, those claims

are **DISMISSED WITH PREJUDICE**. The Motion is **DENIED** as to Count I

(Defamation), as related to the post stating that Plaintiff spraypainted swastikas.

*/s/Susan K. DeClercq*
SUSAN K. DeCLERCQ
United States District Judge

Dated: _____

---

false."). However, that protection does extend to bar the IIED claim because such a claim requires passing upon the "outrageousness" of the speech at issue. This is a problem because outrageousness "is a highly malleable standard with 'an inherent subjectiveness about it which would allow the jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression.'" *Snyder*, 562 U.S. at 458 (quoting *Hustler*, 485 U.S. at 55). If the First Amendment means anything, it is that "the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Id.* (quoting *Texas v. Johnson*, 491 U.S. 397, 414 (1989)). Thus, while liability may be imposed for "false" speech dealing with matters of public concern in certain circumstances, it may not be for "outrageous" speech dealing with the same.